LEVINE, J.
The issue presented is whether the trial court erred by allowing similar fact evidence from two other collateral victims and whether it became an impermissible feature of the trial.
Grier was charged by information with seventeen counts, including lewd or lascivious molestation, lewd or lascivious conduct, attempted sexual battery, felony battery, battery, and sexual battery. The charges arose out of a physical relationship that Grier had with three teenage girls.
The trial court severed the three counts involving one victim, M.R., and stayed the remaining counts involving the other victims. Prior to trial, the State made an ore tenus motion to present testimony from Grier’s other alleged victims, L.R., L.H., and P.H.,[1] as Williams rule witnesses. The trial judge ruled that there were an “overwhelming number of points of similarity” between the testimony of the victim and the proffered Williams rule witnesses. Specifically, the trial court noted the following similarities: all four met Grier through their association with the Jehovah’s Witnesses; each girl started her “intimacy” with the defendant between the ages of fourteen and seventeen; Grier made comments on each girl’s body; Grier was a family friend of each girl (except L.H.); each girl worked with Grier in some capacity; each girl testified that Grier touched her throughout her body; and the alleged molestations happened at both Grier’s house and the girls’ houses. Over Grier’s objection, the witnesses were permitted to testify.
At trial, M.R. testified that she first met Grier when she was about seven or eight years old. Grier worked with M.R.’s parents, and when M.R. was about thirteen years old, Grier temporarily moved into *99 her family’s home. M.R., L.R., and L.H. would “hang out” with Grier. M.R. considered Grier to be like an “older brother.” He would counsel her on “everything,” including her relationships, her looks, and her clothing.
M.R. told the jury in detail of Grier’s inappropriate conduct. One evening, M.R. was asleep in a hotel and awoke when Grier began rubbing her arms, back, and buttocks. Some weeks later, M.R. was watching television at Grier’s house, and Grier abruptly started to kiss her. In yet another incident, M.R. explained that L.H. and Grier’s brother watched as Grier began to rub and kiss M.R. on the sofa. At some point, Grier went to M.R.’s house and started rubbing M.R.’s vaginal area and kissing her thighs. These encounters continued for several weeks. M.R. explained that her encounters with Grier ended after she spent time with her peers and realized that Grier’s behavior was wrong.
M.R. testified that Grier would kiss and fondle L.H. in her presence, and she related stories that Grier told her regarding L.H. Grier told M.R. that he rubbed his penis on L.H.’s body and ejaculated on her neck. M.R. also explained that Grier kept records where he would “rate” girls based on their looks, character, personality, and spirituality. One of Grier’s records stated that M.R. was the “hottest thing on the planet” and asked rhetorically if he would “let things go with just a scratch or a sniff,” i.e., whether he would pursue a more intimate sexual relationship with M.R.
Following M.R.’s testimony, the State presented the testimony of the two Williams rule witnesses, L.R. and L.H. L.R. testified that she met Grier at the age of ten when Grier started working with her mother. L.R. explained that she looked up to and trusted Grier as a devout member of her faith. Grier told L.R. she was “not as pretty” as M.R. and L.H., but he told L.R. he would be her “first kiss.” During summer 2000, when L.R. was seventeen, Grier “[ljifted [her] bra up, started kissing [her] breasts, kissing [her] on the mouth, on [her] thighs, [and her] stomach.” Grier also tried to place L.R.’s hand on his penis. Grier repeatedly touched, rubbed, and kissed L.R. over several weeks.
L.H. testified that she started working with Grier when she was fourteen years old. L.H. and Grier developed a friendship that extended beyond work. Grier spoke to L.H. about relationships and how to get a person “to fall for you.” He frequently commented on L.H.’s clothing, advising her to wear tighter shirts. When L.H. started working full-time with Grier in 2000, the relationship became more intimate. Grier made advances on L.H., including placing his tongue in L.H.’s bellybutton, looking at L.H.’s brassiere, touching various parts of her body, and placing her hands on his genitals. Grier tried to penetrate L.H.’s vagina and anus with his finger. Grier masturbated in front of L.H. on multiple occasions. L.H. testified that she did not have knowledge of Grier’s interactions with M.R. but stated that she knew Grier kept records about other women.
We review the trial court’s admission of Williams rule evidence for an abuse of discretion. Stav v. State, 860 So.2d 478, 480 (Fla. 4th DCA 2003). The trial court admitted the collateral crimes evidence under section 90.404(2)(a), Florida Statutes, permitting admission of prior acts as proof of motive, opportunity, intent, knowledge, or absence of mistake. The statute tests the relevancy of collateral crime testimony, albeit within strict guidelines. Hewing v. State, 513 So.2d 122, 124 (Fla.1987). Even if a trial court finds that the collateral crime evidence is admissible *100 under section 90.404(2), the court must also take a second step and weigh the danger of unfair prejudice against the probative value of the evidence. § 90.403, Fla. Stat. (2008); McLean v. State, 934 So.2d 1248, 1256 (Fla.2006). If the danger of unfair prejudice “substantially outweighs” the probative value, the trial court must exclude the evidence. § 90.403, Fla. Stat. (2008).
In this case,[2] the trial court found that Grier’s conduct took place during the spring and summer of 2000 on a handful of occasions with each girl. The trial court further found that there were an “overwhelming number of points of similarity, and very few points of dissimilarity” between the victim’s testimony and the Williams rule witnesses’ testimony. Specifically, the court below noted roughly seven or eight points of similarity between M.R.’s testimony and the proffered testimony of L.R. and L.H. The only distinction noted by the trial court was that Grier was not a friend of L.H.’s family, in contrast to the close relationship Grier had to M.R. and L.R.’s parents.
Grier argues that the trial court erred by allowing L.R. and L.H. to testify because their statements included allegations of “kissing and touching their bare breasts.” He also objects to testimony from L.H. as to attempted digital insertion in her genitalia, which Grier did not attempt on M.R.
“A collateral crime proven by similar evidence does not need to be absolutely identical to the crime charged in order to be admissible. Moreover, similar fact evidence relevant to prove a material fact other than identity does not need to meet the rigid similarity requirement applied when such evidence is used to prove identity.” Triplett v. State, 947 So.2d 702, 703 (Fla. 5th DCA 2007) (citations omitted); see also Macias v. State, 959 So.2d 782 (Fla. 4th DCA 2007). The court in Triplett found that the “similarity between the collateral act of molestation” and the charged molestation shared “numerous similarities” with the charged offense and, as such, upheld the trial court’s admission of the witness testimony as within the “broad discretion of the trial court.” 947 So.2d at 704.
Likewise, in Macias, the defendant was a supervisor in a drug court program who offered special assistance to participants in exchange for sexual favors. At trial, the victim testified to exchanging sexual favors for leniency, while the collateral witness did not perform any sexual acts, despite the defendant’s request and offer in exchange. The court found the collateral evidence to be sufficiently similar despite the lack of sexual contact in the collateral incident:
Macias gained access to A.A. and A.B. in the same manner, as both of them were undergoing mandatory drug counseling under the guidance of Sherman, who in turn was supervised by Macias; both had private meetings with Macias ... in Macias’ office with no one else present; both were close in age at the time, A.A. eighteen years old, and A.B. twenty-two; the two victims resembled each other, as both had blond hair, blue eyes and were of relatively slim build; Macias had similar conversations with both where he told them that if they “took care of him” or did “what he needed [them] to do,” he *101 would help them in Drug Court; and, lastly, Macias told both women not to tell anyone about these conversations.
959 So.2d at 785. In the present case, like Macias, many points of similarity between the charged act and collateral act exist. In that case, the variance in the extent of sexual contact between the victim and the collateral witness with the defendant did not render the collateral witness testimony irrelevant. As such, Macias suggests that variations in the degree of conduct between the charged crime and the collateral crime are not dispositive of questions of relevancy.
The First District’s opinion in Donton v. State, 1 So.3d 1092 (Fla. 1st DCA 2009), also illustrates the kinds of variations in conduct that will not defeat a claim of relevancy. In that case, the court allowed the collateral crimes evidence of the appellant “licking” and “touching” the vaginal area of a five-year-old girl, where the appellant was charged with sexual battery on a male teenager by “penile union with, or penetration of, the victim’s anus.” Id. at 1093. In the present case, the distinction between attempted digital insertion and fondling is less significant than the variation of conduct detailed in Donton.
Finally, if the differences in conduct were such that the dissimilarity to the charged crime made the evidence inadmissible, the introduction of this evidence would still be harmless as to the issue of relevancy due to the fact that L.R. and L.H. provided sufficient similar, admissible evidence. Cann v. State, 958 So.2d 545 (Fla. 4th DCA 2007). Moreover, M.R. testified at length regarding Grier’s admissions of conduct with L.H., including his attempted digital insertion and public masturbation. Grier never objected to M.R.’s testimony regarding these statements. As such, even if L.H. had not testified, the jury would still have learned of these acts.
As to the issue of unfair prejudice,[3] Grier argues that the admission of the collateral evidence became a “feature of the trial.” The trial court needs to act as a “gatekeeper” and render evidence inadmissible when it would have a “prejudicial effect.” McLean, 934 So.2d at 1261. Collateral crime evidence becomes an impermissible “feature” where collateral act evidence “overwhelms” evidence of the charged crime and becomes “an impermissible attack on the defendant’s character or propensity to commit crimes.” Samuels v. State, 11 So.3d 413, 418 (Fla. 4th DCA 2009) (quoting Bush v. State, 690 So.2d 670, 673 (Fla. 1st DCA 1997)).
M.R.’s testimony was longer and more detailed than the testimony of both L.R. and L.H. combined. The State limited its questioning of the collateral crimes witnesses to questions regarding Grier’s mo-dus operandi. Further, the fact that multiple collateral crime witnesses testified is not per se error, where the collateral crimes are sufficiently similar and probative of material issues. Peterson v. State, *102 2 So.Sd 146, 156 (Fla.2009) (holding that it was not error to admit evidence of three collateral crimes, so long as the evidence was relevant and not unduly prejudicial). The supreme court has noted the following:
[I]t is not solely the quantity but also the quality and nature of collateral crimes evidence in relation to the issues to be proven that determines whether its admission has “transcended the bounds of relevancy to the charge being tried.” Indeed, this Court repeatedly has affirmed the admission of extensive collateral crimes evidence where that evidence was wholly probative of material issues.
Conde v. State, 860 So.2d 930, 946 (Fla.2003). The State made few references to the collateral witnesses in closing (all were in rebuttal), and the trial court gave cautionary instructions throughout the trial to prevent L.R.’s and L.H.’s testimony from becoming a feature. Hernandez v. State, 15 So.3d 901 (Fla. 4th DCA 2009).
For these reasons, we affirm the appellant’s convictions and sentence.

Affirmed.

FARMER, J., concurs.
WARNER, J., concurs specially with opinion.

. Ultimately, P.H. did not testify at trial.

. We note that Grier has not challenged the relevancy of L.R.’s and L.H.'s testimony. Instead, his argument rests on the second part of our inquiry — the probative value of L.R.'s and L.H.'s testimony was, he claims, outweighed by unfair prejudice. Nevertheless, because the relevancy and prejudice issues are interrelated, we will address both parts of the inquiry.

. In McLean, the supreme court considered whether section 90.404(2)(b), Florida Statutes, violates due process. In concluding that the statute did not run afoul of the United States Constitution or the Florida Constitution, the supreme court enumerated four nonexclusive factors for a trial court to evaluate in assessing whether unfair prejudice to the defendant substantially outweighs the probative value of evidence of prior molestations: (1) the similarity of the prior acts to the charged acts, including the location, age, and gender of the victims, and manner in which the acts were committed; (2) the temporal proximity of the prior acts to the charged conduct; (3) the frequency of the prior acts; and (4) the role of intervening circumstances. 934 So.2d at 1262. We note that the trial court considered these factors when it permitted L.R. and L.H. to testify at trial, although that court based its order admitting the testimony on section 90.404(2)(a).