# Supreme Court of Florida

_____

No. SC12-890
_____

**BILLY JIM SHEPPARD, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[September 4, 2014]

PER CURIAM.

Billy Jim Sheppard, Jr., appeals from two judgments of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm his convictions and sentence of death.

## BACKGROUND

### Overview

Billy Jim Sheppard, Jr., was convicted and sentenced to death for the July 20, 2008, first-degree murder of Monquell Wimberly in Jacksonville, Florida. Sheppard was also convicted of the first-degree felony murder of Patrick Stafford,

which occurred earlier on the same day, for which Sheppard was sentenced to life imprisonment.[1] As the discussion of the evidence will show, Patrick Stafford died after being shot repeatedly by two different guns in the early morning hours of July 20 after he was found in a car where he had been sleeping. Several hours later, Sheppard and his codefendant Rashard Evans stole a car at gunpoint from Dorsette James at a Prime Stop convenience store, with Sheppard driving it away from the store.

Shortly after 10 a.m., on that same day, Sheppard and an unidentified driver went in the stolen car to the Hollybrook Apartments where they encountered sixteen-year-old Monquell Wimberly, who was riding a bicycle. Sheppard was identified by a security guard as the person she saw on the passenger side of the stolen car who shot Wimberly multiple times from the window of the car. Ballistics evidence showed that the gun that fired two of the three projectiles recovered from Stafford's body was the same gun that killed Wimberly. In his statements to detectives, Sheppard admitted stealing Dorsette James's car but denied being armed, and he did not confess the murders to police. Evidence was presented, however, that Sheppard confessed to a jail inmate that he and Evans shot Stafford when he refused to cooperate with their attempt to steal the car in

---

1. Sheppard was also convicted of attempted robbery and additional firearms and theft offenses.

which Stafford had been sleeping. The inmate also testified that Sheppard confessed that he and Evans drove to the apartment complex where Sheppard shot Wimberly from the window of the car.

After the jury found Sheppard guilty of both murders, a penalty phase proceeding was held at which the jury recommended a sentence of death by an eight to four vote for the murder of Wimberly and a sentence of life in prison for the murder of Stafford. The trial court found one aggravator comprising a prior violent felony conviction for shooting and wounding a young man when Sheppard was age 14, for which he was prosecuted and sentenced as an adult, and the July 20, 2008, murder of Stafford. The court weighed this aggravator against the statutory mitigator of Sheppard's age of 21 and fifteen nonstatutory mitigators, including his difficult childhood, his slow mental ability, and his generally good character. After a Spencer[2] hearing at which letters from Sheppard's family members were submitted in further mitigation, the court sentenced Sheppard to death for the murder of Wimberly and imposed a sentence of life imprisonment for the murder of Stafford.

Sheppard raises five issues on appeal. However, before we discuss each issue, we review the evidence presented in the guilt phase in greater detail.

_____

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

## The Guilt Phase

Dtalya Barrett, a security guard at the Hollybrook Apartments on King Street in Jacksonville, testified that on the morning of July 20, 2008, she was working at the apartment's entrance gate. When she heard gunshots shortly after 10 a.m., she ran to the end of the sidewalk where she saw a person holding a gun out of the passenger side window of a passing car driving toward her. The person holding the gun shot a teenage boy, later identified as sixteen-year-old Monquell Wimberly, who was riding a bicycle. Barrett ran to call police and when she returned, she saw the shooter leaning out of the car window and looking back toward the boy on the ground. She could not see the driver but could see the passenger quite well from about ten to twelve feet away, and she said the shooter was a black male with "dreads." When the police arrived, she was placed in the police car to wait but "ran off" because, as she explained, the police put her where everyone could see her and "they didn't think about whether he can come kill us or whatever. . . . I wanted to get out and get my kids and leave." During a break, the trial judge spoke to counsel and noted that no objection was lodged to this testimony, "and it was probably not warranted," but the judge did not want the

attorneys to mention her comment in closing argument in any way to suggest a "Golden Rule"[3] violation or suggest the jurors had anything to fear.

Barrett did meet with detectives the next day and was shown a series of photographs on the computer. She initially picked out one person as "looking like" the shooter, and although police investigated that person, he was not arrested. When Barrett met again with detectives and was shown more photographs she picked out Sheppard's photograph, and she identified Sheppard in court as the man she saw shoot Wimberly. She also identified Dorsette James's stolen car as matching the vehicle in which the shooter was riding.

Khalilah Mejors, a resident at the Hollybrook Apartments, was standing on the third-floor balcony on the morning of July 20, 2008, and saw the young man riding the bicycle. She testified that as a dark gray Ford Crown Victoria or Mercury vehicle approached the boy and slowed down, the boy put his hands in the air and was immediately shot, and he was shot several more times while on the ground. She could not see the shooter's face or that of the driver but did see the lower part of an arm sticking out of the passenger side window holding the gun. She ran to the victim and found him still alive but not speaking.

---

3. A "Golden Rule" violation occurs when arguments or comments invite the jurors to imagine themselves in the victim's position during the crime. See Victorino v. State, 127 So. 3d 478, 492-93 (Fla. 2013).

Kieva Sherrod was also a resident at the Hollybrook Apartments on July 20, 2008, where she lived on the third floor facing King Street. She was standing on the balcony with her cousin Khalilah Mejors that morning and also saw Wimberly ride by on a bicycle toward the entrance to the apartment complex. She saw the vehicle, which looked like a gray Ford Crown Victoria, drive up to the person on the bicycle and slow down, and the boy on the bicycle stopped. She testified that she sat down, but heard a gunshot and when she looked again, the boy on the bicycle had his hands up in the air. She saw a gun pointed out of the window of the car, but she could not see who was holding the gun, although she could see that there were two people in the car. Sherrod testified that the boy was shot several more times and fell off the bicycle. She ran inside to get her phone to call the police and then ran down to the boy to see if he was still alive. She said he was still alive but she did not hear him say anything. She identified a photograph of the car, which witnesses later identified as one stolen from Dorsette James at the Prime Stop convenience store, as the car she saw that morning.

Approximately one and a half hours before Wimberly was shot, a car matching the description of the Wimberly shooter's car was stolen at gunpoint from Dorsette James at the Prime Stop Food Store. Willie Lee Carter, Jr., testified that he was at the store with James, who was since deceased. Carter, who was outside but not in the vehicle, heard James exit the store and say, "Man, don't do it

like that." When Carter looked, he saw two men getting into James's car, a gray Crown Victoria. One man, described as shorter and with light brown skin and dreadlocks, got into the driver's side of the car. The other person, a tall man with darker skin, got in the passenger side and the car drove away. When Carter asked James why he let them take his car, Carter testified that James told him one of the men had a gun. James later picked Sheppard's photograph out of a photographic array as the driver and a photograph of Rashard Evans as the person who got into the passenger side of the car. Photographs taken from inside the Prime Stop store showed both Evans and Sheppard at the store that morning.

The stolen car was recovered that evening near where the shooting occurred, but no DNA was found for comparison purposes. Latent fingerprints and palm prints taken from the stolen car were submitted for examination and comparison. Fingerprint examiner Richard Kocik of the Jacksonville Sheriff's Office testified that some of the fingerprints taken from the stolen car were of no value and were not compared to anyone. The only prints of value taken from the vehicle, palm prints and some fingerprints, matched Rashard Evans.

Detective Bobby Bowers, Sr., of the Jacksonville Sheriff's Office, testified that after learning of the identification of Evans in regard to the stolen car, an arrest warrant was sought, and that when Carter identified Sheppard in connection with the stolen car, Bowers also sought an arrest warrant for him. Sheppard was not

immediately located and, after a special unit was contacted to apprehend him, Sheppard was taken into custody in Winter Haven by United States Marshals on August 8, 2008, and returned to Duval County.

Before Detective Bowers arrived to investigate the Wimberly shooting scene on King Street on July 20, 2008, he had been investigating the shooting of Patrick Stafford, which occurred at 6 a.m. that same morning on Academy Street in Jacksonville. Shamika Worthey lived on Academy Street and, in the early morning hours of July 20, 2008, went out to her car to retrieve some diapers and saw Patrick Stafford asleep in her brother's car. She returned to the house and went back to sleep but was awakened by the sound of gunshots at about 5:30 or 5:45 a.m. She could not see anything from the window and woke her uncle and brother and asked if Stafford had a gun and was told he did not. She looked again and could then see that Stafford was lying by a tree in the yard. He appeared to have blood on his shirt.

Leporyon Worthey, Shamika's brother, testified that he and Patrick Stafford, his cousin, arrived at the house on Academy Street after midnight and that he went to bed around 3 a.m., leaving Stafford sitting on the hood of Leporyon's car waiting for a ride. When his sister woke him around 6 a.m., Leporyon found Stafford on the ground, with the car door open and no one else present. Leporyon said Stafford tried to speak but could not do so. Crime scene detective Howard

Mac Smith was dispatched to the Academy Street scene and found a Ford LTD parked in the yard with the door open and the passenger side window shattered. Stafford's body was near the car and shell casings found around the area were collected for forensic examination.

Dr. Valerie J. Rao, medical examiner for District 4, Duval County, testified that she performed the autopsy on Patrick Stafford. He sustained multiple gunshot wounds, including to his thigh, buttocks, back, shoulder, and arms. The bullets that entered his back also went though his chest, left lung, esophagus, trachea, and clavicle. The bullet that entered his left buttock also went through his left kidney, stomach, liver and diaphragm. He suffered other gunshot wounds as well, and Dr. Rao testified that, in her opinion, the cause of Stafford's death was multiple gunshot wounds.

Dr. Rao also performed the autopsy on Monquell Wimberly. He sustained a number of bullet wounds, including two on his back close to his head. One bullet fractured his spine and then went through his abdominal aorta, liver, right hemi-diaphragm and right lung, then through the intercostal space, lodging in the head of his humerus on the right side. The other bullet traveled a very similar course. She found another gunshot wound on his back where the bullet entered and then went through his spleen, hemi-diaphragm, left lung, and right lung. Wimberly had another gunshot wound to his back where the bullet entered and traveled through

his left rib, left kidney, root of the mesentery, right hemi-diaphragm, and then exited the right side of the chest wall. Wimberly also had a gunshot wound on his left buttock in which the bullet crossed to the right side behind the prostate gland, and lodged in his right thigh. Dr. Rao opined that the cause of Wimberly's death was multiple gunshot wounds.

David Warniment, a Florida Department of Law Enforcement firearms examiner, testified that although no firearms were ever discovered or tested, he did examine and compare bullets and shell casings from both the Stafford and Wimberly shootings. He testified that two bullets recovered from Stafford's body were fired from the same Smith and Wesson 9mm caliber pistol that fired three bullets recovered from Wimberly's body. Of the six shell casings found at the scene of Stafford's shooting on Academy Street, four of those shell casings matched six shell casings found on King Street where Wimberly was shot, and were therefore fired from the same gun. The other two shell casings recovered from Academy Street where Stafford was shot were fired from a single gun, but it was not the same gun that was fired at both crime scenes. Thus, two different firearms were used to shoot Stafford on Academy Street and only one of those firearms was used to shoot Wimberly on King Street.

After Sheppard was taken into custody, he was interviewed by Detective Bowers and Detective Glen Warkentien. The interview was videotaped and the

tape was played for the jury after it was redacted, and admission of it in redacted form was not objected to by Sheppard's counsel. In the interview, Sheppard was read his Miranda[4] rights and waived them. He initially denied carjacking Dorsette James's car, which was later identified as the car from which Wimberly was shot. However, later in the interview, Sheppard admitted that he and Evans took the car for a "joyride," that he got in the driver's side, and that he got out of the car at Acorn Street while Evans kept the car. Sheppard denied that they took the car by force or with guns. Sheppard also denied any involvement in the Wimberly and Stafford murders.

Michael Roberts, who was currently incarcerated, testified concerning his conversations with Sheppard while they shared a jail cell prior to Sheppard's trial. Roberts testified that in April 2009 he was incarcerated in the Duval County Jail for about three months when he met Sheppard there. About two weeks after Roberts began sharing the cell with Sheppard, an inmate named Danny "Dirt" James was moved in. James knew Sheppard "from the streets" and, Roberts said, the three of them became close and shared information about their cases.

Roberts testified that at one point during their incarceration, Sheppard asked him how much weight an eyewitness's testimony would be given if that witness identified Sheppard as the shooter, but there was no other evidence. Roberts

4. Miranda v. Arizona, 384 U.S. 436 (1966).

- 11 -

testified that he told Sheppard the testimony would be crucial. Roberts testified that Sheppard also asked how much weight it would carry if a codefendant related facts of a crime to a third party when the other codefendant was not present. Roberts said he asked about it and Sheppard told him Evans, his codefendant, was housed on the other side of the jail and was bragging about a carjacking, saying "the guy bucked and that they shot him," referring to the Stafford murder. Roberts said that when Sheppard was explaining why he was charged with murder, Sheppard said his codefendant Evans had talked and it got back to the police, who then matched the ballistics from the two shootings.

Roberts testified, "Actually he said that - - he said that they were going hard [apparently a reference to doing drugs] and they were trying to find a car and that they went to rob a guy for his car and he bucked. They were trying to take a car from him and he bucked," which meant he was not giving up the car. "So he said that him and Rashard shot him. . . . He said they both put fire on him," which meant shooting him. Roberts also testified that he overheard Sheppard telling some other inmates that, later on the day of the carjacking attempt, they "shot that fuck nigger from West Jax that was on his bike" and with whom Sheppard said he had argued. Roberts explained that Sheppard said he had been in a big argument a few days before with "some boys from West Jax because him and Dirt, they're from Paxon and PYC," which are gang references.

Roberts testified that Sheppard later told him directly about shooting the boy on the bicycle after he and Evans had shot the man who "bucked" in the attempted carjacking earlier that morning. Roberts testified, "And he said that he pulled up to him and he was on a bicycle. And they slowed down and he hung his arm out the window and started shooting. And he said the dude looked at him and was, like - - (demonstrating) - - and shot. And he said he went ahead and shot him. He didn't say how many times." Roberts testified that Sheppard then described the woman who could identify him:

> And then he said whenever they - - he shot the guy. He looked up when they were pulling away, and there was a lady looking right in his face. And he said it was just - - and I was like: Well, why didn't you - - you know, why didn't you shoot her? Basically I said that. And he was like: Oh, I wish I would have killed her. He said because it was - - I guess the way he put it was when they were pulling - - when he looked up - - after he shot the guy, he looked up and she was looking at him but Rashard was already pulling away.

Roberts testified that Sheppard told him Evans would not testify against him, but Sheppard was worried about the woman who could identify him.

Roberts also testified that at the point when his own charges were about to be dropped, Sheppard asked him for a favor. When Roberts asked what the favor was, Sheppard said, "Man, you know, if she don't come and testify on me, they ain't got no case. You told me yourself. . . . [y]ou said, man, if she don't come testify, they ain't got no case on me at all, other than what my codefendant told that other guy." Roberts said Sheppard told him he would get all the information

- 13 -

to Roberts through Sheppard's sister and could pay him with his income tax return. Roberts said he did not want to look weak so he said he would think about it, but never gave Sheppard an answer. Roberts said Sheppard asked him several times after that what he was going to do, and then Sheppard was moved out of the jail dorm. Roberts testified, "He wanted me to kill her." Roberts further testified that he never told law enforcement about this information while his own charges were still pending in Duval County and that he was not promised anything for his testimony, although he later divulged the information in hopes of a reduced sentence on subsequent charges in Nassau County. He testified that he pled guilty to those charges and, at the time of trial, was facing a possible sentence of thirty years in prison.

On January 12, 2012, the jury returned a verdict finding Sheppard guilty of the first-degree murder of Monquell Wimberly as charged, and that Sheppard actually possessed and discharged a firearm in the commission of the murder causing great bodily harm or death. The jury also found Sheppard guilty of the first-degree felony murder of Patrick Stafford in the commission of or attempt to commit armed robbery, and that Sheppard actually possessed and discharged a

firearm in the commission of the offense causing great bodily harm or death.[5]

Thus, the case proceeded to the penalty phase of trial.

## Penalty Phase and Sentencing

The penalty phase commenced on January 20, 2012, and the parties

stipulated that on June 22, 2001, Sheppard was convicted of the felony of

aggravated battery and shooting or throwing deadly missiles relating to the January

15, 2001, shooting of Christopher Wakefield in case number 16-2001-CF-1277-

AXXX-MA.  The State also presented the testimony of Dwayne L. Crouch, a

deputy with the Jacksonville Sheriff's Office in 2001, who investigated the

January 15, 2001, shooting of Wakefield.  Wakefield was shot in the leg while

leaving a mall in a vehicle with five to seven other people.  Sheppard was

prosecuted as an adult and received a sentence of four years in prison followed by

two years of probation, but he violated probation and was sentenced to five years

and six months in prison.  The State also presented two victim impact witnesses.

Monique Hodge, Monquell Wimberly's mother, read a statement to the jury about

---

5. The jury also convicted Sheppard of attempted armed robbery from Stafford, as charged, and possession and discharge of a firearm during commission of the offense causing great bodily harm or death.  The jury convicted Sheppard of "grand theft auto" of Dorsette James's vehicle as charged, and found that Sheppard actually possessed a firearm during the commission of the offense.  Finally, in a separate deliberation after the first charges were decided by the jury, Sheppard was convicted of possession of a firearm by a convicted felon and found to have actually possessed the firearm during that offense.

her son and Frankie Johnson, Sr., Patrick Stafford's father, read a statement about Stafford, after which the State rested.

The defense presented a number of mitigation witnesses. Juwaun Newkirk, Sheppard's 13-year-old nephew, described Sheppard as very kind. Sheppard lived with him for a while and would reward him for doing well in school. Sheppard still writes to him. Alonzo Adams, Sheppard's cousin, testified that Sheppard is a happy, fun guy who is quick to joke. Chiquita Adams, Sheppard's cousin and sister to Alonzo, said Sheppard is like a brother to her and that she spent a lot of time with him when she was little. She testified that he cleaned for her mother and made sure she had her medications. They exchange letters and she hopes to continue to have a relationship with him. Curtiayanna Tompkins, a friend of Sheppard, met him in 2008 after Sheppard was arrested, and they have had a relationship through letters and telephone calls.

Bessie Walker, Sheppard's grandmother, testified that she raised Sheppard for some years because his mother suffered from drug and alcohol dependency. Sheppard was always respectful, looking out for her and worrying about her health. He would cook and clean willingly and was a great help around the house. She testified that she warned Sheppard not to "hang around" some of the people he met on the streets and not to give them money that he got from his deceased father's social security benefits. Sheppard's father died of sickle cell disease when

Sheppard was a young child, as did his two aunts and grandfather. Walker said it was hard on the family when Sheppard went to prison at age 14 and that after he got out, Sheppard would visit her and her daughter and would help her daughter, who had medical problems.

Kathryn Lunford-Walker, Sheppard's mother, testified that she and Sheppard have a good relationship and are close, although there was a period of time when she had drug and alcohol dependency. When Sheppard was young, he had to live with his grandmother because Lunford could not care for him and her other children. She testified that shortly after Sheppard was sent to prison, he became close to her new husband, who has since passed away. She testified that Sheppard then "got himself shot" in a drive-by shooting in March 2008, and that Sheppard's best friend, Joshua Swann, was murdered in June 2008. She said she loves Sheppard and wants to continue to have a relationship with him.

Quintina Sheppard-Newkirk, Sheppard's sister, testified that she and Sheppard were always close and grew up in the same house. When their father died, Sheppard was age eight and she was ten. They did not spend much time with their mother for some years when they lived with their grandmother. She testified that they saw their mother during that time and knew she loved them, but that when she relapsed with drugs and alcohol she would become violent with her and Sheppard. When they lived with their mother, they moved every couple of months

because she would fail to pay the bills or there would be something wrong with the residence. Sometimes there was no electricity and not enough food. Their grandmother loved them and did provide stability.

Newkirk testified that there was a lot of gunfire in their neighborhoods when they were growing up and that they heard it on a daily basis. When Sheppard went to prison at age 14, she kept in contact with him, and when he got out, he lived with her for a while. She testified that when he was released from prison, he was different and would barricade himself in the bedroom and sleep a lot, and that he lost his easygoing spirit. He did not stay with her full time but was "kind of floating." When his good friend Joshua was shot and killed, Sheppard took it very hard. She identified some photographs of Sheppard as a child, with their father and grandmother, and with her and their cousin. She identified photographs of Sheppard when he was age 14 and in prison, and other family photographs. She said she loves her brother and hopes to maintain a relationship with him.

The defense rested and Sheppard confirmed to the court that he chose not to testify and that he agreed with the decision to call only the witnesses his lawyers presented. The jury deliberated and recommended death for the murder of Monquell Wimberly by a vote of eight to four. For the murder of Patrick Stafford, the jury recommended life imprisonment without the possibility of parole. A

Spencer[6] hearing was held on March 8, 2012, at which the State presented three additional victim impact statements from Patrick Stafford's son, Monquell Wimberly's aunt, and Wimberly's sister. The defense introduced letters of mitigation authored by family members Quintina Sheppard-Newkirk, Bessie Walker, Chiquita Adams, Kathryn Lunford-Walker, Margaret Cummings, Cheryl Cummings, a cousin named Muffin, and by Marva Hendrix, a family friend. The defense also submitted two certificates issued to Sheppard acknowledging his achievements.

The trial court followed the jury recommendations in sentencing Sheppard to life for the first-degree felony murder of Patrick Stafford and death for the first-degree murder of Monquell Wimberly. In the March 30, 2012, order sentencing Sheppard to death for the murder of Wimberly, the trial court found one aggravating factor, encompassing the Stafford murder conviction and two prior violent felonies, and assigned it great weight. The court found one statutory mitigating factor, Sheppard's age of 21 at the time of the crime, and assigned it little weight. The trial court also found fifteen "non-statutory" mitigating factors.[7]

6. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

7. The nonstatutory mitigators were: (1) Sheppard is a loving brother, son, grandson, and friend (little weight); (2) he is capable of establishing and maintaining bonds with others (little weight); (3) he is friendly/good with family members, children, and animals (little weight); (4) he always has a desire to help his family members especially when they are sick (little weight); (5) he has shown

## ANALYSIS

## A. Videotape of Interrogation

The redacted version of the videotaped statement that Sheppard gave to detectives after Sheppard was taken into custody was played for the jury. Sheppard contends that admission of the videotape was fundamental error because the jury heard Detective Bowers repeatedly accuse Sheppard of lying, and heard Bowers say the detectives knew he was either the shooter or the driver of the car from which Wimberly was shot. At the outset of the interview, Detective Bowers advised Sheppard that he does not care for lying and was not going to lie to Sheppard, but he expected the same from him. Bowers said, "You don't have to

concern in regard to family members and how they have had to endure his arrest and trial and the defendant can still continue to positively impact people close to him (little weight); (6) his mother abused alcohol and drugs during his childhood, forcing him to live with his grandmother who had responsibilities of her own (some weight); (7) he was forced to witness frequent and ongoing violence as a very young child (some weight); (8) he has a limited education (little weight); (9) he suffered from poverty (slight weight); (10) he lost his father at a very young age (some weight); (11) he entered the adult penal system at age 14 and spent what should have been his high school years behind adult prison bars (some weight); (12) he was intoxicated at the time of the offense (very slight weight); (13) he is amenable to a productive life in prison (slight weight); (14) he suffered from mental disabilities that caused him to develop at a slower pace than other children his age and resulted in people taking advantage of him (slight weight); and (15) he suffered the death of his stepfather in the months leading up to his arrest (little weight).

- 20 -

answer anything that you don't want to" but he expected the truth when Sheppard did answer.

Sheppard was asked if he was with the PYC gang and Sheppard denied it. Bowers then told Sheppard that he knew the answers to the questions he was asking and said, "All I'm here to find out, is Billy that cold that he needs to be locked up forever. Is everything that comes out of his mouth a lie? Because so far, you're batting a thousand. . . . All I'm trying to do, Billy, is find out are you a stone-cold killer and a liar or is there goodness in you." Sheppard then confirmed he had a PYC tattoo on his arm, and later said that 'it" was in his "file," referring to a PYC notation.

Detective Bowers then confronted Sheppard with evidence of his presence at the Prime Stop convenience store and witness statements that Sheppard and Evans took Dorsette James's car at gunpoint, which Sheppard denied. Then Bowers said, "My main concern with you knowing is are you the trigger man, are you the driver? Because you're one or the other." Bowers then said, "[Y]ou may have been an unwilling participant. You may have been along for the ride. It may have been an accident, the fact that he got shot. It may have been the intention you were going to scare someone without the intent of killing them . . . ." Sheppard continued to deny a carjacking, but then admitted to taking James's car for a "joyride." Detective Bowers told Sheppard, "Tell me the whole truth or none of

the truth. We're trying to get on a (inaudible) where I can believe you because that's important to you, and you know that if I can't make (inaudible) you know you won't be able to convince 12 people." Sheppard ultimately admitted that he and Evans took the car when James was in the store and that Sheppard got in the driver's side of the car, although Sheppard said he later got out of the car at Acorn Street and Evans assumed the driver's seat. Sheppard never admitted anything concerning either of the murders. No objections were made to any portion of the redacted videotaped statement that was presented to the jury.

Sheppard contends that Bowers' statements in this interview constituted fundamental error because they accuse Sheppard of lying numerous times; tell him that if he cannot make the detectives believe him, he will never convince a jury; and say that the detectives know he is either the shooter or the driver. Sheppard contends these statements were so prejudicial that his right to a fair trial was violated. Error is fundamental if it "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Harrell v. State, 894 So. 2d 935, 941 (Fla. 2005) (quoting Brown v. State, 124 So. 2d 481, 484 (Fla. 1960)). It is error that goes to the "foundation of the case." Ray v. State, 403 So. 2d 956, 960 (Fla. 1981) (quoting Sanford v. Rubin, 237 So. 2d 134, 137 (Fla. 1970)). The principle is applied only in rare cases where the interests of justice present a compelling

- 22 -

demand for its application.  Id.  As we explain, we conclude that fundamental error did not occur in presentation of the edited videotape of Sheppard's interview with Detective Bowers.

Sheppard relies primarily on our decision in Jackson v. State, 107 So. 3d 328 (Fla. 2012).  In that case, prior to trial, Jackson filed a motion in limine objecting to the prospective introduction of the videotaped interrogation on several grounds, including that the tape contained numerous statements of the detective's belief in Jackson's guilt.  He also objected to the introduction of a redacted version of the tape, and again objected at trial prior to the tape's introduction.  This Court in Jackson found that the detectives made repeated expressions of their personal beliefs and knowledge that Jackson committed the murder as well as statements praising the victim and eliciting sympathy for the victim.  We held that admission of the videotape in Jackson was harmful error that was more prejudicial than probative, and that the great majority of the detectives' statements did not provoke relevant responses from Jackson and did not set forth circumstances in which Jackson admitted any culpability or involvement.  See id. at 340-41.

The present case is distinguishable from Jackson in several respects.  First, no motion in limine or objection to the videotaped interview was made in this case.  Thus, the threshold that Sheppard must meet is that of fundamental error, requiring a showing that the alleged inadmissible statements reached down into the validity

of the trial such that the guilty verdict could not have been obtained without that evidence. This threshold has not been met. In Jackson, we identified "some of the most problematic and prejudicial assertions" by the detectives as follows:

> (1) "the only question I have is: Why did you kill her"; (2) "I know you did it. You used a fire extinguisher. I know you did it"; (3) "No. I'm saying something that you did do and you know in your heart you did it"; (4) "There's no doubt in my mind you did it, okay? There's no doubt"; (5) "You have no explanation of how you could have come inside her other than being there raping her and then consequently she dies"; (6) "Well now we're—you're putting us—you in a position where we're not—we don't have any answers for anybody other than 100 percent without a shadow of a doubt you killed Andrea Boyer and you raped her"; and (7) "Michael, you went to the clinic. You brutally raped this girl and you hit her multiple times in the head with a fire extinguisher. You left her there bleeding, half dressed for an employee to find her. . . ." Additionally, the detectives stated that Boyer "[wanted] to start a family," "her parents were very well-to-do," this is not the type of case where the victim "is a nobody," and Boyer was a "rising star in the community."

Jackson, 107 So. 3d at 341. Nothing said by Detective Bowers in the instant case compares with these firm statements of opinion, assertions of guilt, and prejudicial statements made in Jackson.

In this case, Detective Bowers did not repeatedly state his personal opinion that Sheppard was guilty of murder. He did accuse Sheppard of lying in several respects, and warned Sheppard that he knew the answers to many of the questions he was asking. Prior to any accusations of lying, Detective Bowers expressly reminded Sheppard that he did not need to answer any questions, but if he did answer, he should not lie. When Sheppard denied being in the PYC gang, Bowers

- 24 -

warned him again about lying and pointed out the PYC tattoo on Sheppard's arm.[8]

Sheppard also initially denied any knowledge of the carjacking of Dorsette James's car, which was later identified as the car from which Wimberly was shot. However, Bowers confronted Sheppard with photographic evidence placing him and Evans at the convenience store, evidence that the victim said he was carjacked at gunpoint, and the statement that Evans told officers that he was not the killer. Only after that did Sheppard admit to taking the car to "joyride." Thus, this line of questioning and the comments by Bowers successfully obtained Sheppard's confession that he did take the car, although Sheppard continued to maintain he was not involved in the Wimberly shooting.

When Sheppard kept insisting that he did not take James's car by force, Bowers did say, "Tell me the whole truth or none of the truth. We're trying to get on a (inaudible) where I can believe you because that's important to you, and you know that if I can't make (inaudible) you know you won't be able to convince 12 people." Although this implication that Sheppard would bear any burden of proof at a trial was improper, no further mention was made of whether Sheppard can or

---

8. At the time of the investigation, the officers were attempting to establish that the murder of Wimberly was the result of a gang disagreement, and there was other evidence at trial about this gang-related motive. Ultimately, the State did not pursue the gang affiliation as a motive or as an aggravator in the murder.

cannot convince a jury in a criminal trial, and does not rise to the level of fundamental error.

As Sheppard also contends, Bowers said his main concern was knowing if Sheppard was the triggerman or the driver, because he was one or the other. This statement, although expressing the detective's opinion or knowledge that Sheppard was either the shooter or the driver, was logically based on evidence that Sheppard had initially driven away in the stolen car with Evans and evidence that codefendant Evans told officers that he was not the shooter. Bowers followed up the comments with the statement that Sheppard may have only "been along for the ride" without any intention to shoot anyone, and noting that such things can get out of control. Sheppard's response to this line of questioning was "I didn't kill nobody (inaudible) I don't go that way, never seen that boy." Later, Bowers again suggested a scenario in which Sheppard was just the driver and someone else was the shooter. Bowers told Sheppard that "[w]hen these things happen, it needs to come out."

Rather than Bowers expressing a strong personal opinion that Sheppard shot Wimberly, he is indicating that the evidence places Sheppard as either the shooter or the driver, as it in fact does, and invites Sheppard to explain if he was not the shooter. We conclude that although some of the comments by Detective Bowers were improper statements of belief that Sheppard was lying and that he was either

- 26 -

the shooter or the driver, the error was not fundamental. Eyewitness testimony established that Sheppard was the person who shot Monquell Wimberly numerous times from the window of the car Sheppard and Evans stole from Dorsette James. Evidence was presented that Sheppard confessed his guilt to both murders to Michael Roberts. The same gun that Sheppard used to kill Wimberly was also used in the Stafford shooting. Thus, we conclude that the error does not "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Harrell, 894 So. 2d at 941. It is not error that goes to the "foundation of the case." Ray, 403 So. 2d at 960. This is not one of the rare cases in which the interests of justice present a compelling demand for application of the principle of fundamental error. See id.

Even though we find no fundamental error in admission of the videotape, we reiterate that a jury is inclined to give great weight to the statements made by law enforcement officers by virtue of their position. See Tumblin v. State, 29 So. 3d 1093, 1101 (Fla. 2010). For this reason, great care should be taken by law enforcement and by prosecutors that such statements expressing belief in the defendant's guilt or belief that the defendant is lying generally not be placed before the jury. There is "increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt." Martinez v.

State, 761 So. 2d 1074, 1080 (Fla. 2000). As we cautioned in Jackson, "it is especially troublesome when a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." Jackson, 107 So. 3d at 340. With this caveat, we find no merit in Sheppard's claim of fundamental error in this issue.

**B. Codefendant Evans' Out-of-Court Statement to Chaeva Powell**

Chaeva Powell, Rashard Evans' girlfriend, testified that when Evans was in jail at a time before Sheppard was arrested, she spoke with Evans by telephone while Sheppard was present with her. She was allowed to testify over objection that Evans told her to tell Sheppard to "get rid of the package." She did not know what he was talking about but relayed the message to Sheppard, and when she asked him about the package, Sheppard told her it was a gun. The State argued in part that the testimony regarding Evans' directive to Powell to tell Sheppard to "get rid of the package" was not offered for the truth of the matter asserted and thus was not inadmissible hearsay. The State contended that it was not important what the package was, but what was important was the defendant's response when the message was relayed, which was an inculpatory statement by Sheppard.

The defense countered that because the out-of-court statement concerning the package came from codefendant Evans and was about Sheppard, it implied Sheppard had knowledge of what was in the package, which turned out to be a gun.

Thus, Sheppard contends, the codefendant's statement was inculpatory as to Sheppard, and violated Bruton v. United States, 391 U. S. 123 (1968), which prohibits admission into evidence of a codefendant's out of court confession or statement that implicates the defendant. The trial court noted that Evans' statement to Powell "is not offered to prove the truth of any matter asserted. It barely asserts any matter. But to the extent that it does, in an abundance of caution and in the light most favorable to the defense, it still - - it's irrelevant whether the statement was true or not. What is relevant was the [defendant's] response, and that's the only reason the statement's coming in."

"The standard of review of a trial court's evidentiary rulings is abuse of discretion. Fitzpatrick v. State, 900 So. 2d 495, 514-15 (Fla. 2005). The trial court's discretion is limited, however, by the rules of evidence, Johnston [Johnston v. State, 863 So. 2d 271, 278 (Fla. 2003)], and by the principles of stare decisis." McDuffie v. State, 970 So. 2d 312, 326 (Fla. 2007). With this standard in mind, we first examine whether Evans' statement to Powell was hearsay.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(c), Florida Statutes (2013). Evans' statement to Powell was not a declarative one making a statement that was offered to prove its truth. Rather, Evans' statement to Powell was an imperative one expressing a demand

that Powell convey a message to Sheppard. Only after Powell followed the directive and conveyed the message to Sheppard, and only after she followed up with a question about the package, did Sheppard make his own inculpatory admission that the "package" referred to was a gun.

Evans' directive could be interpreted as implying that there was a package that both Evans and Sheppard knew about and which Sheppard had the ability to obtain and the need to dispose of. Sheppard contends that this makes Evans' statement an incriminating one as to Sheppard and violates <u>Bruton</u>, which prohibits admission of a non-testifying codefendant's confession or statements incriminating the defendant. However, Evans' request to Powell was not a confession and, on its face, is not expressly incriminating as to Sheppard. Evans did not describe the package or explain what was in it. At the point that Evans made his command to Powell to pass along the message, it was not clear what package was referred to or what it contained. The only incriminating statement arising from the testimony was Sheppard's own response to the question by Powell when he said that the package was a gun. Because the testimony about Evans' statement to Powell is not inadmissible hearsay and did not relate to any confession or inculpatory statements by Evans about Sheppard, <u>Bruton</u> was not violated.

Even if Evans' statement was inadmissible hearsay, we conclude that it was harmless beyond a reasonable doubt. Evans' reference to a package was not

necessary to prove that Sheppard stole the vehicle that was used in the shooting of Wimberly, that he was the individual who shot Wimberly from the window of the stolen car with a gun used in both murders, or that he confessed the details of both murders to Michael Roberts. Even if the testimony concerning Evans' request to Powell implied that Sheppard had access to the gun used in the murder of Stafford and Wimberly, that gun was already placed in Sheppard's hand by the testimony of Barrett and other witnesses. After considering both the permissible evidence on which the jury could have legitimately relied, and the alleged impermissible evidence in Powell's testimony, we cannot conclude that the error, if any, contributed to the verdict.[9] See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 2009). Accordingly, relief is denied on this claim.

## C. Dtalya Barrett's Testimony of Her Fear of the Shooter

Dtalya Barrett, the security guard who gave eyewitness testimony about the murder of Monquell Wimberly, also testified that when the police came to investigate, she was placed in a police car to wait. However, she said, she "ran off" because the police put her where everyone could see her and "they didn't think about whether he can come kill us or whatever. . . . I wanted to get out and

---

9. The State made only one brief reference to this testimony in closing argument, noting Powell's testimony that Evans told her to tell Sheppard to get rid of the package and that, when she asked Sheppard about the package, he said it was a gun.

get my kids and leave." No objection was lodged to this statement. On redirect examination, Barrett testified that she was looking closely at the shooter's face, not his arms or hands at that point, and "was really looking at him, making sure he wouldn't come kill me, and I was really trying to get - - thinking that [the victim] was my nephew."

During a break, the trial judge spoke to counsel and noted that no objection was lodged "and it was probably not warranted," but the judge cautioned the attorneys not to mention her comment in closing argument in any way to suggest a "Golden Rule" violation or to suggest the jurors had anything to fear. The State explained that the witness made these statements in the course of explaining why she left the scene and did not speak to police on the day of Wimberly's shooting— a matter possibly reflecting unfavorably on her credibility if left unexplained. Later, Detective Bowers testified without objection that when he spoke to Barrett at the scene, she was "panicky and very, very upset." He said she was nervous because the "individual had seen her" and that when he let her go to check on her children that morning, she did not return to the scene. However, Barrett called him the next day and explained she had been "terrified," and she did submit to several subsequent interviews.

Sheppard now argues that this testimony concerning Barrett's fear of the shooter constituted fundamental error in that it inflamed the minds of the jurors,

violated the prohibition against a "Golden Rule" argument, and was an improper attack on Sheppard's character by suggesting a propensity for violence. We disagree. In this case, Barrett's comments explained the reason she left the scene without speaking with detectives. Without her explanation, her own credibility would have been adversely affected. Moreover, Barrett did not know the identity of the shooter at the time she expressed fear of the shooter's possible return. Thus, her fleeing the scene because of fear was not directed specifically and personally at Sheppard, but simply at the person she saw shoot a young man for no apparent reason—a man who clearly saw her face and knew she was a witness. Her comments did not challenge Sheppard's character but simply reflected that she was reluctant to speak with police to identify the shooter because she did not want any repercussions.

This testimony did not "reach down into the validity of the trial" such that the verdict of guilty could not have been obtained without the assistance of the error. See, e.g., Harrell, 894 So. 2d at 941 (quoting Brown, 124 So. 2d at 484). The evidence that convicted Sheppard was Barrett's eyewitness testimony and testimony of others linking Sheppard to the shooter's car. In addition, jailhouse informant Michael Roberts testified that Sheppard confessed the details of the crime to him and that Sheppard tried to hire him to kill Barrett. Further, in closing

argument, the State did not use Barrett's testimony in any improper "Golden Rule" argument or in any way that would inflame the passions of the jurors.

Finally, even if objection to Barrett's testimony had been preserved and found to be error, we conclude it was harmless beyond a reasonable doubt. After considering both the permissible evidence on which the jury could have legitimately relied, and the alleged impermissible evidence, there is no basis to conclude that the error, if any, contributed to the verdict. See DiGuilio, 491 So. 2d at 1135. Thus, relief is denied on this claim.

### D. Juror Impropriety

Before closing arguments in the guilt phase, the bailiff brought to the trial court's attention the fact that two jurors wished to speak to the judge. Juror N was brought in and told the judge, attorneys, and defendant outside the presence of the other jurors that on the bus to the parking lot the night before, alternate Juror B told her, "I'm an alternate" and "I find him - -  and she gave me her verdict." Juror N said this statement by Juror B made her uncomfortable and was not right but, Juror N said, "I'm not influenced by her." She said, "Absolutely, Judge, I'm not influenced." When the judge asked Juror N what Juror B said about the verdict, Juror N said the alternate told her she would find Sheppard guilty. Juror N did not know if Juror B spoke with any other jurors. When given the opportunity to question Juror N, defense counsel asked if the statement was loud enough for

others to hear, and Juror N responded that "it was noisy on the bus shuttle. I turned around to look at Bobby and it was just so noisy. Everybody was just chattering away. . . ." "And she [Juror B] was just talking as fast as she could to me." Juror N said she had no idea if others could have overheard Juror B, but she did not see Juror B talking to any other jurors around Juror N.

Juror B was then brought in to discuss her comments on the jury bus. She denied telling Juror N that she would find the defendant guilty, and said she had not made up her mind and had sleepless nights worrying over the case. The defense had no questions for alternate Juror B. The State objected to excusing Juror B, but represented to the court that it would not object to both Juror N and Juror B being excused. Defense counsel initially disagreed with dismissing Juror B and said, "I just don't see why we can't put her on the end of the alternate list." As to Juror N, counsel said, "I don't think there's any grounds to dismiss [Juror N] at all." The defense did not ask to remove Juror B and did not ask to question the whole panel.

The judge stated that he believed it was likely that Juror B did say something inappropriate and he was worried she would say something else to the jurors. Even so, defense counsel said he was "not necessarily moving to have any of them excluded. Miss [B] right now is an alternate juror, and I don't know that I need to even worry about that until - - ." Then, defense counsel said, "I don't have any

problem . . . if the court excuses her at all and that's fine with me," indicating Juror B. Defense counsel again said there was no reason to remove Juror N. The trial court did remove Juror B and allowed defense counsel to alter the order of the remaining alternate jurors. When the court announced it was removing Juror B, defense counsel said, "That's fine with me." Juror N was not removed.

Sheppard now argues that Juror B's statement to Juror N constituted juror misconduct and premature deliberation that shifted the burden to the State to prove he was not prejudiced. Sheppard contends that the prosecutor and the trial judge had an independent obligation to conduct questioning of the other jurors as to the alleged premature deliberation and because that was not done, a new trial is required. We disagree. First, the claim of juror misconduct is not preserved. See James v. State, 843 So. 2d 933, 936 (Fla. 4th DCA 2003) (holding that the defendant failed to preserve for appellate review his claim that the trial court erred in denying his motion for new trial based on juror misconduct where he failed to raise such claim at trial); see also Hampton v. State, 103 So. 3d 98, 112-13 (Fla. 2012). In this case, defense counsel never asked the court to question the entire panel, and he initially objected to even dismissing alternate Juror B. Thus, the claim he now makes on appeal is not preserved and he accordingly argues that it constituted fundamental error.

Although Sheppard is correct that where "premature deliberations" are shown, the burden shifts to the State to show the defendant is not prejudiced, the facts here do not establish that "premature deliberations" occurred. In a somewhat analogous situation, we held in Reaves v. State, 826 So. 2d 932 (Fla. 2002), that the contention that one juror attempted to discuss guilt prematurely did not require interviews of the entire panel of jurors because there was no evidence that there was any agreement among other jurors to disregard their oaths and ignore the law, nor did the allegation imply that the jury was influenced by outside sources or improper material. Id. at 943. In contrast, in Williams v. State, 793 So. 2d 1104, 1106 (Fla. 1st DCA 2001), the district court held that the allegation that "two jurors discussed the case during trial and expressed an opinion as to guilt before the close of the evidence" was sufficient to set forth a prima facie case of premature jury deliberations by two members of the jury. The First District followed Williams in Ramirez v. State, 922 So. 2d 386 (Fla. 1st DCA 2006), which is relied on by Sheppard in this appeal. In Ramirez, the district court held that jury interviews should have been allowed on the allegation of premature jury deliberations where a juror told a bailiff that the jury was split as to the defendant's guilt until after the defendant testified. Id. at 390.

The Fourth District Court of Appeal in Gray v. State, 72 So. 3d 336 (Fla. 4th DCA 2011), recognized this Court's holding in Reaves that a lone juror's attempt

to discuss the defendant's guilt prematurely is insufficient to warrant juror interviews, but found in <u>Gray</u> that the court abused its discretion in denying juror interviews where the allegations suggested that "<u>multiple</u> jurors were improperly discussing the case during trial and were expressing opinions as to the defendant's guilt before the close of the evidence" and it was not an "allegation of a lone juror attempting to discuss the case prematurely." <u>Gray</u>, 72 So. 3d at 338. These cases make clear that a claim of premature jury deliberations sufficient to require questioning of the entire jury panel requires that multiple jurors discuss the case together and discuss their opinions as to the proper verdict.

The facts in this case show that a premature discussion of the verdict by multiple jurors did not occur. Juror N said alternate Juror B voiced her opinion of what verdict she would reach, but there was no indication that Juror N reciprocated and discussed her views of the evidence or her ideas concerning guilt. In fact, Juror N said she knew Juror B's comment was improper, reported it to the court, and assured the court she was not influenced by it. There was also no indication that any other juror heard Juror B's comments. The trial judge asked Juror N whether Juror B spoke to any other jurors and she replied that she did not know, but that Juror B was just talking to her. Defense counsel asked if the comment was loud enough for other jurors to hear, to which the judge added, "That's a darn good question. Thank you. Could anyone else overhear?" Juror N responded that Juror

B was "talking as fast as she could to me" and that it was "just so noisy" on the bus and everyone was "chattering away," but she did not know if anyone else overheard. Juror N also confirmed that she had not mentioned this incident to any other jurors. Even if another juror might have overheard Juror B's comment, such would not constitute "premature deliberations" as described in the decisions cited above.

Sheppard supports his contention that fundamental error occurred requiring a new trial by citing Fischer v. State, 429 So. 2d 1309 (Fla. 1st DCA 1983). That case is distinguishable, however. In Fischer, the district court reversed a conviction where an alternate juror was inadvertently allowed to deliberate with the jury in violation of the requirement that alternate jurors are required to be discharged prior to deliberations. When the jury returned the verdict, however, the error was discovered and counsel objected and moved for a mistrial. Thus, the issue on appeal in Fischer was not a claim of fundamental error but whether the error was harmless. On appeal, the First District concluded that the presence and participation of the alternate juror in the jury room during deliberations was not harmless error and required a new trial because the sanctity of the jury and its deliberations was violated. In so holding, the First District cited the Fourth District's decision in Berry v. State, 298 So. 2d 491 (Fla. 4th DCA 1974), in which the court concluded fundamental error occurred when an alternate juror was

allowed to sit in the jury room during deliberations and was a "stranger" to the deliberations. The court in Berry found that this violated the rule that the alternate juror must be discharged and "[t]he presence of [the alternate juror] in the jury room could have operated as a restraint upon the jurors and their freedom of expression" and "[t]he attitudes of [the alternate] conveyed by facial expressions, gestures or the like may have had some effect upon the decision of one or more juror." Id. at 493. The court in Berry held that "[t]he deliberations of the jury must be conducted in privacy and secrecy. Anything less infringes upon the defendant's constitutional right to trial by jury." Id.

In the present case, the alternate juror was not allowed in the jury room to deliberate and did not in fact engage in any "deliberations" with other jurors. The testimony of Juror N that alternate Juror B told her what her verdict would be does not constitute a "discussion" or an agreement between multiple jurors concerning the defendant's guilt. The trial court questioned both Juror N and alternate Juror B, and allowed defense counsel to question them. The court dismissed Juror B from the panel even though defense counsel did not argue for that remedy. Juror N also assured the court that Juror B's improper comments would not affect her consideration of the evidence. It has not been established that any error occurred in the handling of Juror B's statement, much less fundamental error vitiating the

entire trial. Therefore, relief on this claim of juror misconduct or premature deliberation is denied.

### E. Proportionality of the Sentence and Sufficiency of the Evidence

Sheppard contends that a death sentence is not proportionate in this single-aggravator case. In reviewing proportionality, the Court follows precedent that requires that the death penalty be "reserved only for those cases where the most aggravating and least mitigating circumstances exist." Terry v. State, 668 So. 2d 954, 965 (Fla. 1996). In doing so, this Court "will not disturb the sentencing judge's determination as to 'the relative weight to give to each established mitigator' where that ruling is 'supported by competent substantial evidence.' " Blackwood v. State, 777 So. 2d 399, 412-13 (Fla. 2000) (quoting Spencer v. State, 691 So. 2d 1062, 1064 (Fla. 1996)). The Court will "review the weight the trial court ascribes to mitigating factors under the abuse of discretion standard." Smith v. State, 998 So. 2d 516, 527 (Fla. 2008). The Court will "affirm the weight given an aggravator if based on competent substantial evidence." Blake v. State, 972 So. 2d 839, 846 (Fla. 2007). "The weight to be given aggravating factors is within the discretion of the trial court, and it is subject to the abuse of discretion standard." Buzia v. State, 926 So. 2d 1203, 1216 (Fla. 2006).

Sheppard contends that this is a single-aggravator case with substantial mitigation and, thus, the death sentence is disproportionate and should be reversed.

He points out this Court's precedent holding that "[a]s a general rule, 'death is not indicated in a single-aggravator case where there is substantial mitigation.' " Almeida v. State, 748 So. 2d 922, 933 (Fla. 1999) (quoting Jones v. State, 705 So. 2d 1364, 1367 (Fla. 1998)). He contends that only in cases involving "nothing or very little in mitigation" should death be affirmed in a case involving only one aggravator, citing Songer v. State, 544 So. 2d 1010, 1011 (Fla. 1989). We explained in Jones, "Under Florida's capital sentencing scheme, death is not indicated in a single-aggravator case where there is substantial mitigation. Although this legal precept—and indeed the rule of objective, dispassionate law in general—may sometimes be hard to abide, the alternative—a Court ruled by emotion—is far worse."). Jones, 705 So. 2d at 1367 (footnote omitted). For example, in Nibert v. State, 574 So. 2d 1059 (Fla. 1990), we vacated a death sentence and remanded for imposition of a life sentence where the single aggravator was HAC and the trial court found no statutory mitigation, but found "possible" nonstatutory mitigation involving Nibert's childhood. See id. at 1061.

However, we have previously affirmed the death penalty in single-aggravator cases where the single aggravator is weighty and where the mitigation is insubstantial. Bevel v. State, 983 So. 2d 505, 524 (Fla. 2008). The Court affirmed the death sentence in Bevel where the single aggravator consisted of a double homicide and a prior violent felony a year before the murders. Id. at 524.

We explained in Bevel that the Court has previously held the death penalty to be proportionate in cases involving multiple murders where the only aggravating circumstance was a prior violent or contemporaneous felony and the mitigation was minimal. See, e.g., Lindsey v. State, 636 So. 2d 1327, 1329 (Fla. 1994) (finding death proportionate in a double homicide case, where the only aggravator was based on prior violent felony convictions, including a prior second-degree murder conviction for the first count and the contemporaneous first-degree murder conviction for the second count, and minimal nonstatutory mitigation including the defendant's poor health).

We have also held the death penalty to be proportionate in a single-aggravator case involving two prior violent felony convictions, attempted sexual battery and kidnapping, and minimal nonstatutory mitigation, including appropriate courtroom behavior (very little weight) and mental disorders (very little weight). LaMarca v. State, 785 So. 2d 1209, 1216-17 & n.4 (Fla. 2001) (noting that proportionality was supported by the fact that LaMarca committed the murder soon after being released from prison on the prior violent felony convictions); see also Ferrell v. State, 680 So. 2d 390, 391 (Fla. 1996) (finding death proportionate where the only aggravator was a prior violent felony conviction for second-degree murder, and where a number of nonstatutory mitigating circumstances were found and assigned little weight).

In this case, Sheppard was convicted of two homicides. The trial court imposed a life sentence, as recommended, for the murder of Stafford and found one aggravating circumstance supporting the death sentence for the murder of Wimberly. That one aggravator, however, was based on the murder of Stafford just hours earlier, as well as Sheppard's prior conviction as a juvenile of two other violent felonies—a 2001 aggravated battery, and shooting or throwing a deadly missile, relating to the shooting of 15-year-old Christopher Wakefield when Sheppard fired into a vehicle occupied by numerous teenagers. This single aggravator was given great weight.

In mitigation, the trial court found that Sheppard's age of 21 at the time of the crime was a statutory mitigating circumstance, but gave it only little weight. The court also found nonstatutory mitigating circumstances, which were assigned only little, slight or some weight, which can be summarized essentially as follows: Sheppard's role in his family, his helpfulness, and concern for his family and for others; that his mother abused alcohol and drugs during his childhood; that he was forced to witness violence as a child; that he lost his father at a young age and spent his teen years in prison; his limited education and impoverished background; his intoxication and drug use on the day of the crime; that he can have a productive life in prison; his mental disabilities and slow development as a child, and the fact that he was in special programs and on medication as a child; and that he suffered

the death of his stepfather in the months before these crimes. After considering the heavily weighted aggravator involving an almost contemporaneous murder and an earlier violent felony, and after considering the mitigation set forth above, we conclude that this case qualifies as an exception to the rule that the death sentence is not generally appropriate in a single-aggravator case. Thus, we find the death sentence to be proportionate in this case.

Sheppard does not challenge the sufficiency of the evidence, but this Court has an independent obligation to review the evidence for sufficiency in cases in which a sentence of death has been imposed. See, e.g., Ferguson v. State, 417 So. 2d 639, 642 (Fla. 1982). We conclude that competent, substantial evidence was presented in this case sufficient to support the verdict of guilt as to the first-degree murder conviction for the killing of Wimberly and the felony murder conviction for the killing of Stafford. The State presented direct evidence of Sheppard's confession to both murders by way of the testimony of Michael Roberts. Sheppard told Roberts that he shot Stafford when he "bucked" as he and Evans tried to steal the car in which Stafford had been sleeping. He also told Roberts that he shot the boy on the bicycle. Sheppard confessed on videotape to taking Dorsette James's car, which was identified by several witnesses as the car from which Wimberly was shot. Dtalya Barrett identified Sheppard as the person she saw shoot Wimberly from the passenger side window of the gray Crown Victoria vehicle,

which matched the description of James's stolen car. Ballistic evidence tied the gun used in the Wimberly murder to the gun used in the Stafford murder. The evidence was therefore sufficient to convict Sheppard of all the offenses with which he was charged.

## CONCLUSION

For the reasons set forth above, we affirm Sheppard's convictions and sentence of death.

It is so ordered.

LABARGA, C.J., and QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.
PARIENTE, J., concurs in result with an opinion.
LEWIS, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring in result.

I join the majority in affirming the convictions and death sentence. However, I disagree with the majority's conclusion that the statement of codefendant Evans, as testified to by witness Chaeva Powell, was not hearsay. I also write to emphasize that, although we affirm the convictions in this case, we strongly condemn the admission of police interrogation into evidence where the detective expresses an opinion about the defendant's guilt, which recently compelled this Court to reverse a murder conviction and order a new trial in Jackson v. State, 107 So. 3d 328 (Fla. 2012). I address each point in turn.

- 46 -

First, I respectfully disagree with the majority's conclusion that codefendant Evans' statement to Powell, in which Evans told her to tell Sheppard to "get rid of the package," was not hearsay. The meaning of this out-of-court statement was that Sheppard possessed the gun that was used in the murders and needed to get rid of it, which is the essence of what the State wished to present to the jury. In my view, the only possible relevance of this statement was to prove the truth of the matter asserted, which was that the codefendant was directing Sheppard to get rid of "the package," and that Sheppard knew that "the package" was the gun. As this Court has previously explained, "[w]hen the only possible relevance of an out-of-court statement is directed to the truth of the matters stated by a declarant, the subject matter is classic hearsay even though the proponent of such evidence seeks to clothe such hearsay under a nonhearsay label." Keen v. State, 775 So. 2d 263, 274 (Fla. 2000).

The majority's attempt to circumvent the hearsay restrictions by drawing a distinction between "declarative" and "imperative" statements, without citing any case or statute to support this distinction, is a distinction without a difference. See majority op. at 29-30. Instead, regardless of whether the statement was "declarative" or "imperative," it was offered for its truth, and was therefore hearsay that should have been excluded. See § 90.801(1)(c), Fla. Stat. (2013) (defining

hearsay as an out-of-court statement offered in evidence to prove the truth of the matter asserted).

Nevertheless, I do agree with the majority that the admission of the statement was harmless beyond a reasonable doubt. This conclusion is supported by a close review of the impact on the jury of the impermissible admission of this statement, which was referenced only briefly during the State's closing argument, and the permissible evidence on which the jury could have legitimately relied, including the testimony of eyewitness Dtalya Barrett and jailhouse informant Michael Roberts that placed a gun in Sheppard's possession. See State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986).

Second, while I agree with the majority's legal analysis of the fundamental error claim concerning the videotaped interrogation, I emphasize that our affirmance is not an approval of questioning being admitted into evidence that conveys the detective's views as to the defendant's guilt. As this Court has previously stated, exposing the jury to an investigating officer's opinion about the defendant's guilt is particularly troublesome because it "could convey the impression that evidence not presented to the jury, but known to the investigating officer, supports the charges against the defendant." Martinez v. State, 761 So. 2d 1074, 1080 (Fla. 2000). For this reason, this Court's determination that no fundamental error occurred based on the particular circumstances of this case

- 48 -

should not be construed as an endorsement of the admission of this type of interrogation into evidence, and all parties should take great care to ensure that the jury is not exposed to improper interrogation that could cast doubt on the validity of the conviction.

An Appeal from the Circuit Court in and for Duval County,
John Bradford Stetson, Jr., Judge - Case No. 162008CF011059BXXXMA

Richard Adam Sichta, Jacksonville, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Patrick M. Delaney, Assistant Attorney General, Tallahassee, Florida,

for Appellee