# Third District Court of Appeal

## State of Florida

Opinion filed March 25, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D12-3113
Lower Tribunal No. 11-2665
_____

**Roseline Louidor,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Marisa Tinkler-Mendez, Judge.

Carlos J. Martinez, Public Defender, and Stephen J. Weinbaum, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Jay E. Silver, Assistant Attorney General, for appellee.

Before WELLS, EMAS and SCALES, JJ.

SCALES, J.

Roseline Louidor, the defendant below, appeals her conviction and sentences for manslaughter, aggravated child abuse, and child neglect. For the reasons set forth below, we affirm without prejudice to allow the defendant to file a motion pursuant to Florida Rule of Criminal Procedure 3.850.

## I. BACKGROUND

### A. *Daquan's Death and the Charges Against Louidor*

Following the death of two-year-old Daquan Davis, Louidor was arrested and charged with first-degree murder, aggravated child abuse, and child neglect.[1]

Louidor, who was friends with Daquan's mother, Cherelle, had been caring for Daquan for several days prior to Daquan's death. Louidor maintained that Cherelle retrieved Daquan from Louidor's care, and kept Daquan for the weekend prior to his death. Louidor insisted that when Daquan returned from his weekend under Cherelle's care, Daquan was bruised, sick, and listless.

Cherelle denied taking Daquan home with her, and asserted that Daquan was with Louidor and Louidor's boyfriend[2] for ten days before Daquan was rushed to the hospital. Cherelle testified that she had visited Daquan during that ten-day

---

[1] The medical examiner testified that the cause of Daquan's death was homicide, caused by one or more severe blows to his abdomen.

[2] Louidor's boyfriend was also charged in connection with Daquan's death, but his case was severed from Louidor's, pursuant to Bruton v. U.S., 391 U.S. 123 (1968). He did not testify at Louidor's trial.

period, but had never removed Daquan from Louidor's care, and that Daquan was fine when she completed her visit.

B. *Louidor's Interrogation by the Police Detectives*

Prior to her arrest, Louidor was interrogated by three police detectives for six to eight hours over a two-day period; though she admitted to spanking the child, Louidor steadfastly denied ever kicking, punching, or otherwise injuring him.

The interrogation was videotaped and memorialized on a DVD. Defense counsel stipulated to the admission and playback of the DVD at trial, provided that certain portions, wherein police referred to Louidor's boyfriend, be redacted.[3,4] Louidor's attorney made no other objection to the introduction of the interrogation DVD.

---

[3] See Bruton, 391 U.S. at 132. In Bruton, the United States Supreme Court held that, in a joint trial, the admission of a non-testifying codefendant's confession that inculpates the other non-confessing codefendant constitutes a violation of the Confrontation Clause of the Sixth Amendment. Id. at 125.

[4] The State requested that the trial court read the parties' stipulation to the jury:

> State: Judge—and if you would at this time read our stipulation, I would appreciate it.
> . . . .
> Court: Ladies and Gentleman, portions of the DVD you are about to view have been redacted by stipulation of the State and defense. Both parties agree that there are some parts of the DVD that are not relevant for your determination or consideration of this case. You are not to speculate on the parts that have been redacted.

Over the course of the trial, the interrogation DVD was played to the jury on four different occasions. Defense counsel objected only twice—both times to portions of the DVD wherein the detectives mentioned statements made by Louidor's boyfriend—asserting the State's failure to redact those portions was a <u>Bruton</u> violation. Defense counsel moved for mistrial on this basis, which was denied. After both instances, the court instructed the jury that the statements made by the detectives regarding Louidor's boyfriend were not admitted for the truth of what the boyfriend actually said to police.[5]

During the multiple instances that the DVD was played for the jury, each of the three detectives repeatedly and adamantly told Louidor that they knew Louidor was guilty and that she had killed Daquan. At no time did the defense object to the introduction of these statements. In response to the detectives' aggressive interrogation of her, Louidor persistently refused to confess to the crimes for which the detectives were accusing her of committing.

The following are illustrative excerpts from Louidor's interrogation:

> Detective Reyes: Right now you need to tell me the truth, because if it gets in front of a jury, do you want to

---

[5] Although Louidor also raises this <u>Bruton</u> issue on appeal, given (i) the context of the statements; (ii) the curative instruction; (iii) the hypothetical nature of the statements; and (iv) the subsequent testimony from the officers which established that they often use misstatements or lies to see how a suspect reacts, we conclude this claim is without merit and warrants no further discussion. <u>See, e.g.</u>, <u>Looney v. State</u>, 803 So. 2d 656, 672-73 (Fla. 2001); <u>Delgado v. State</u>, 574 So. 2d 1129, 1130 (Fla. 3d DCA 1991).

look like – listen – "I didn't know. I made a mistake. Listen. I lost it. This kid pissed me off so bad," or do you want to just look like a cruel, cruel person?

Louidor: I don't want to look like none of the above, because there is a God –

Detective Reyes: Yes, there is.

Louidor:  – and I didn't do that to that kid. I loved that kid like he was my own.

Detective Reyes: Then who did?

Louidor: You should ask his mother.

. . . .

Detective Reyes: The injuries this child has didn't happen two weeks ago, didn't happen a week ago – some of them did, because he has some old injuries – but the injuries of his – the trauma he has on the inside of his body are within 24 hours.

Louidor: I don't know about that. I did not beat that boy. I put my hand on the bible, and I know.

. . . .

Sergeant Gonzalez: Guys, I need to interrupt you.  We're not asking you who did that.  We know you did that.  We're not asking who.  We know it's you.  I'm not going to argue with you.  It was you.  And as far as I'm concerned, I want to get to the answer.  Not who.  It was her.  I want to know why.  No, no.  I'm not talking to you. Okay?

Louidor:  I promise on my life.

. . . .

5

Detective Reyes: Do you remember maybe hitting him in the stomach? Kicking him? Throwing him? Maybe? Could have –

Louidor: No.

Detective Reyes: Could it have gotten to that?

Louidor: No. No.

Detective Reyes: Never.

Louidor: Never.

Detective Reyes: Never?

Louidor: When I mean never, never. God could help me today. Like I told you all yesterday, I will kiss the dirty ground and show you all, no, I have not.

. . . .

Louidor:  I did not do this to this child.

Detective Reyes:  You ruptured his liver.

Louidor:  No, I have not.

Detective Reyes:  Why? Why? Why? Why?

. . . .

Detective Reyes:  When you ruptured his liver, was he the only one there?  Were you the only one there?

Louidor:  I – that what – that what you're saying, that I ruptured his –

Detective Reyes:  No.  I'm telling you.  I'm not asking you.

. . . .

Louidor:    I love that kid like he was my own (indiscernible).

. . . .

Detective Vera:  You took away his life.

Louidor: – you here with me, and you know –

Detective Vera: And you (indiscernible)

Louidor: – I did not do none of those things.

. . . .

Detective Vera:  You killed him.

Louidor:  God feel it for me.

Detective Vera:  You killed him.

Louidor:  No, I did not.

Detective Vera:  Yes, you did.

Louidor:  No, I did not, sir.

Detective Vera:  You killed him.

. . . .

Detective Vera: You were with him the last week. You were with him the last week.

Louidor: I know I have not done it.

7

Detective Vera: You were with him the last week.

Louidor: I know I have not done it, in the grace of God. God knows.

. . . .

Sergeant Gonzalez: And I want to tell you something. Okay? And I'm looking you in the eyes. I don't believe you. You're lying to me. You know you're lying to me. I know you're lying to me.

Louidor: How I lying –

Sergeant Gonzalez: And you know and I know that you're lying to me. Okay? So –

Louidor: How do you – okay. Did you hear what you just said?

Sergeant Gonzalez: Yeah. Absolutely. I say you're lying to me.

Louidor: How do you know if I'm lying to you?

Sergeant Gonzalez: Because the facts speak for themselves.

. . . .

Louidor: If I knew – I'm telling you, with all my might, with all my soul, I'm telling you the truth. I'm looking in your eye.

. . . .

Sergeant Gonzalez: Because you caused the injuries on the baby, because you did it yourself.

8

Louidor: I did not.

Sergeant Gonzalez: Because you did it yourself.

Louidor: I did not.

Sergeant Gonzalez: Whether you lost control, whether you –

Louidor: I did not.

. . . .

Sergeant Gonzalez: Okay? And you know what you did, and God knows what you did, and I know what you did. The only difference is God saw you do it. You saw yourself do it. Okay? I didn't see you do it.

Louidor: God didn't see me do it.

Sergeant Gonzalez: Of course he did.

. . . .

Detective Reyes: Okay. That's going to be your downfall when this goes in front of a jury, because it – it's going to go in front of a jury, and they see you sitting here saying, "I didn't do it. I didn't do it." The child didn't do it to himself. The dog didn't do it. The – either you, your boyfriend, or both of you. That's it.

Louidor: None of the above.

. . . .

Louidor: I didn't do that, sir.

Detective Reyes: But it happened. You didn't mean it to happen, but it did.

9

Louidor: I did not do that, sir.

## C. *The Jury's Verdict*

The jury found Louidor guilty of manslaughter (a lesser-included offense to the charge of first-degree murder, Count I), aggravated child abuse with an aggravated battery (Count II), and child neglect with great bodily harm (Count III). She was sentenced to twenty-five years on Counts I and II and fifteen years on Count III, all sentences running concurrently.

## D. *Arguments on Appeal*

Louidor concedes that her trial lawyer did not object to those portions of the DVD during which the detectives repeatedly told Louidor that they knew she was guilty and knew she had killed Daquan. Nevertheless, Louidor contends, for the first time on appeal, that this evidence was erroneously admitted and was so prejudicial that it amounted to fundamental error.

The State concedes that these portions of the DVD should not have been played for the jury but contends this error was not fundamental. Further, the State argues that defense counsel's stipulation to this evidence being admitted was a strategic decision.

## E. *Summary of Our Holding*

While we concur that the interrogating officers' opinions as to Louidor's guilt were objectionable and should not have been admitted, in light of defense

10

counsel's stipulation to the admission and play-back of the DVD, as well as defense counsel's affirmative reliance on the DVD throughout the trial, we find that the error was invited by the defense, and therefore any claim of fundamental error was waived.

As explained in more detail below, we affirm without prejudice to Louidor filing a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850.

## II.    ANALYSIS

### A. *Witness' Opinion of Defendant's Guilt – Jackson*

The Florida Supreme Court has made it clear that a police officer's opinion as to the guilt of the accused is inadmissible.  Jackson v. State, 107 So. 3d 328 (Fla. 2012); Martinez v. State, 761 So. 2d 1074 (Fla. 2000).

In Jackson,[6] where the pernicious effect of this type of evidence was most recently addressed by the Florida Supreme Court, defense counsel moved pretrial to exclude a two-hour videotaped interrogation in which police officers repeatedly told Jackson they knew he was guilty.  The trial court denied the motion, and, although the videotape was shortened to thirty-seven minutes, the remaining portion included instances of the detective telling Jackson, "I know you did it" and "there's no doubt in my mind you did it, okay?"

---

[6] The opinion in Jackson was issued one month after Louidor's trial.

The Jackson Court held that the trial court abused its discretion in overruling the defense objection and admitting these portions of the videotape. The Jackson Court acknowledged that, as a general rule, any witnesses' opinion as to the guilt or innocence of a defendant is inadmissible. Further, the Court noted, "there is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt," (quoting Martinez, 761 So. 2d at 1080), because "[p]olice officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy . . . [and] [a] jury is inclined to give great weight to their opinions[.]" Jackson, 107 So. 3d at 340 (quoting Tumblin v. State, 29 So. 3d 1093, 1101 (Fla. 2010)). Finally, the Jackson Court acknowledged, "it is especially troublesome when a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." Jackson, 107 So. 3d at 340 (emphasis added).

B. *Fundamental Error*

Because defense counsel in Jackson objected to the admission of the interrogation tapes, the Jackson Court did not address whether allowing the jury to hear the tapes amounted to fundamental error, i.e., error so prejudicial to the defendant's ability to receive a fair trial that reversal is required even absent a contemporaneous objection. See Brown v. State, 124 So. 2d 481, 484 (Fla. 1960).

Rather, the Court analyzed whether the improper admission of this evidence over the defense objection was harmless error. Jackson, 107 So. 3d at 342. In determining that the error was not harmless, the Court agreed with Jackson that "the jury could not reasonably have been expected to disregard the strong inference of guilt created by the detectives' repeated statements of personal beliefs and conclusions." Id. at 339.

This case, however, is fundamentally different from Jackson. In the instant case, defense counsel not only failed to object to the admission of the clearly inadmissible portions of videotaped interrogation, defense counsel stipulated to their admission so long as Louidor's boyfriend's statements were redacted. Indeed, we can reverse Louidor's convictions and sentences only if we determine the error was fundamental. J.B. v. State, 705 So. 2d 1376, 1378 (Fla. 1998) (holding "[o]nly when error is fundamental can the error be raised on appeal in the absence of a contemporaneous objection").

For error to be considered "fundamental," it must "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Odeh v. State, 82 So. 3d 915, 921 (Fla. 4th DCA 2011) (quoting Brown, 124 So. 2d at 484); see also Joyner v. State, 41 So. 3d 306, 307 (Fla. 1st DCA 2010) ("Appellate courts are constrained to exercise their discretion concerning fundamental error 'very guardedly' and

13

'only in rare cases'" (quoting Fike v. State, 4 So. 3d 734, 739 (Fla. 5th DCA 2009))).

C. *Invited Error Doctrine*

We need not reach the issue of whether the admission of the objectionable evidence constituted fundamental error in this case, however, because we conclude that the error was invited by the defense. See Universal Ins. Co. of N. Am. v. Warfel, 82 So. 3d 47, 65 (Fla. 2012) ("Fundamental error is waived under the invited error doctrine because 'a party may not make or invite error at trial and then take advantage of the error on appeal.'") (quoting Sheffield v. Superior Ins. Co., 800 So. 2d 197, 202 (Fla. 2001)).

When, as here, the defense stipulates to the admission of evidence and relies on that evidence as illustrated by argument to the jury, or otherwise, the defense should be estopped from later arguing that the admission of that evidence so tainted the trial as to constitute fundamental error. See U.S. v. Jernigan, 341 F. 3d 1273, 1290 (11th Cir. 2003) ("[A] criminal defendant may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error. This is precisely the situation that the invited error doctrine seeks to avert . . . .").[7]

---

[7] The dissent relies on Sheppard v. State, 151 So. 3d 1154 (Fla. 2014) for the proposition that the invited error doctrine does not apply to this case. The dissent characterizes the admission of the redacted videotape in Sheppard as **agreed to** by the defense. See infra pp. 35-36, n.13. The Sheppard opinion, however, merely

14

*D. Rule 3.850 Remedy*

Without concluding one way or another, on this record, it appears as though defense counsel's stipulation to the introduction of the interrogation DVD may have been a strategic decision. Defense counsel's stipulation resulted in the jury seeing and hearing the interrogation which included <u>both</u> the inadmissible opinion testimony <u>and</u> the defendant's steadfast denial that she ever kicked, punched, or otherwise injured Daquan.

Importantly, defense counsel's stipulation to the admission of the DVD was not unqualified. Defense counsel's stipulation was specifically qualified so that

---

states that "admission of it [the redacted videotape] was **not objected to** by Sheppard's counsel." <u>Sheppard</u>, 151 So. 3d at 1161 (emphasis added). There is no mention of any agreement or stipulation by the defense in <u>Sheppard</u>. The instant case is distinguishable because Louidor's counsel specifically **stipulated to**, i.e., agreed to, or invited, the admission and play-back of the DVD.

To the extent that the dissent concludes that defense counsel's stipulation "carries no greater legal significance than would a failure to object when the DVD was offered into evidence at the trial," we disagree. <u>See</u> <u>infra</u> pp. 35-36, n.13. While simply failing to object to the admission and play-back of the DVD would not have triggered the doctrine of invited error, affirmatively agreeing to the admission and play-back of the DVD did trigger application of the doctrine. <u>See,</u> <u>e.g.</u>, <u>U.S. v. Fuentes</u>, 537 Fed. Appx. 921, 926 (11th Cir. 2013) ("'[F]ailing to object does not trigger the doctrine of invited error.' Rather, the doctrine of invited error applies when a defendant affirmatively requests or stipulates to a particular jury instruction.") (citations omitted); <u>cf.</u> <u>Novak v. State</u>, 974 So. 2d 520, 522 (Fla. 4th DCA 2008) ("It is unreasonable to equate a failure to object to a standard jury instruction to 'invited error.'"); <u>Jernigan</u>, 341 F. 3d at 1290 ("[B]y affirmatively agreeing to the playing of the tapes, Jernigan effectively caused, i.e., invited, any <u>Bruton</u> error that resulted from the jury's hearing them."). Further, as discussed in the next section, the record shows that defense counsel affirmatively relied on the DVD as evidenced by argument to the jury. <u>See</u> <u>infra</u> Part II(D).

15

statements made by Louidor's boyfriend in the interrogations were not admitted per <u>Bruton</u>.  Indeed, defense counsel objected to the portions of the DVD in which the interrogators mentioned statements which had been made by Louidor's boyfriend.  <u>See</u> <u>supra</u> p. 4.

Hence, it appears, at least from the record on plenary appeal, that the defense's stipulation may have been strategically designed so that certain otherwise inadmissible statements would be admitted, while others would be omitted.

Additionally, in opening statement and closing argument, defense counsel commented to the jury on Louidor's refusal to confess to the crimes, implicitly arguing to the jury that only a truly innocent person could withstand such aggressive interrogation.[8]

_____

[8] In opening, defense counsel stated:

> Then we go to the police investigation. The police investigation – they brought her in. They interviewed her. You're gonna see the videotape. **You look at it, and you make up your mind as to what was said and what was not said**.

(emphasis added).

> In closing, defense counsel argued:

> They can go to the tape, and they can pick and choose all they want. But you know the tape – and you know at least the first interview was like basically a shouting match and an accusation, where all they were doing is, "You're guilty.  You're guilty.  You're guilty," to get her to say, "Oh, yeah.  I struck this child."  That's what that was.  Did

As the record evidence regarding defense counsel's motivations is unclear, in our view, a more appropriate remedy would be a timely-filed motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The trial court could then, if deemed appropriate, conduct an evidentiary hearing as to whether defense counsel was acting strategically (and if so, whether such strategy was reasonable) or otherwise. See Williams v. State, 515 So. 2d 1042 (Fla. 3d DCA 1987) (finding that counsel's failure to object to the introduction of evidence that would have been deemed inadmissible constituted ineffective assistance of counsel).[9]

---

anybody give her – did anybody have, like, a normal conversation? And then the prosecutor says, "You know she must be lying here, because look at – look at how she's shouting in – in – in the tape." Well, here, this is a court of law, here we know we have a judge. We make objections. People are talked to like human beings, not like animals, like the three people over here, which basically that's what they did. They didn't let her talk. They were in her face, and people don't react well to people being in their face. They tend to raise your voice. **But I suggest to you that – suggest to you that the child was in the care of the mother, and she told them on that day time and time again**. Even one of the – even one of the parts that they played, where the last detective goes in there – the one who's talking about God and whatnot, "How do you think" – You know, they have, like a guessing game. **"How do you think the injuries got there?" What does she say? "Ask the mother. Look at the mother.**"

(emphasis added).

[9] The dissent concludes that defense counsel's stipulation and failure to object to the interrogators' inadmissible opinion testimony was not strategic. See infra pp. 42-47. Rather, the dissent implies that defense counsel unwittingly permitted the introduction of such inadmissible testimony. To support its position, the dissent

## III.   CONCLUSION

We conclude that the doctrine of invited error applies here and effectively waived any complaint of fundamental error that might have occurred below. The defendant's conviction on direct appeal is therefore affirmed without prejudice to the defendant filing an appropriate rule 3.850 motion.

Affirmed.

WELLS, J., concurs.

---

suggests that there could be no strategic reason to allow such testimony to be introduced. See infra p. 45-47. However, defense counsel could have allowed introduction of the evidence so that the jury would infer that no guilty person could withstand such a "browbeating interrogation," as characterized by Louidor. Respectfully, we think any conclusion regarding why such testimony was introduced by stipulation is premature and speculative.

Contrary to the dissent's assertion, there is evidence that defense counsel may have "knowingly permitted the jury to be exposed to evidence that indisputably should have been excluded." See infra pp. 35-36, n.13. In addition to the evidence already discussed, the existence of the stipulation itself, coupled with the sheer quantity of the unchallenged yet prejudicial statements of the officers as to Louidor's guilt and believability—which, as pointed out by the dissent, comprised more than fifty instances—suggests to us that defense counsel may have strategically permitted the jury to be exposed to inadmissible portions of the DVD. To conclude otherwise would suggest that defense counsel was asleep at the wheel. On this record, we are unable to conclude, and express no opinion as to, whether defense counsel's stipulation to the admission and play-back of the DVD, as well as his failure to object to the officers' opinion testimony, was: (a) a strategy decision; (b) the result of defense counsel's failure to review the DVD prior to trial; (c) defense counsel's inattention at trial; or (d) otherwise. Such a determination would be more appropriately resolved at a post-conviction hearing on claims of ineffective assistance of counsel.

18

EMAS, J., dissenting.

I respectfully dissent because, quite simply, the repeated introduction of the concededly improper, inadmissible and inflammatory interrogation DVD constituted fundamental error, depriving the defendant of a fundamentally fair trial, and there is no sound basis to find otherwise.

Although the majority opinion includes extensive excerpts of the improperly-admitted evidence, it fails to provide all of the improperly-admitted portions played for the jury. I set forth those excerpts below, with emphasis added, and include the portions already set forth in the majority opinion to provide proper context. Of course, the written word cannot properly convey the tone, volume, inflection, body language, and other aspects of oral (as opposed to written) communication. Nevertheless, one can envision how these accusatory statements, directed at Louidor by three different detectives during the course of more than six hours of interrogation in the confines of a police station, irrevocably tainted the jury's proper consideration of the evidence:

> Detective Reyes: Right now you need to tell me the truth, because if it gets in front of a jury, do you want to look like – listen – "I didn't know. I made a mistake. Listen. I lost it. This kid pissed me off so bad," or do you want to just look like a cruel, cruel person?

19

. . .

Sergeant Gonzalez: Guys, I need to interrupt you. **We're not asking you who did that. We know you did that. We're not asking who. We know it's you. I'm not going to argue with you. It was you.** And as far as I'm concerned, I want to get to the answer. **Not who. It was her. I want to know why.** No, no. I'm not talking to you. Okay?

Louidor: I promise on my life.

Sergeant Gonzalez: All right? Not who.

Louidor: I'm not a –

Sergeant Gonzalez: It was her.

Louidor: Oh, my god.

Detective Reyes: Listen. When I explain to you today is the last time that you have to explain yourself, you want to look like a cold-blooded murderer, a brutal murderer, or somebody that maybe hit him and didn't know "I hit him that hard," because it's bad. It's – it's bad.

. . .

Louidor: I did not do this to this child.

Detective Reyes: You ruptured his liver.

Louidor: No, I have not.

Detective Reyes: Why? Why? Why? Why?

. . .

Detective Reyes: When you ruptured his liver, was he the only one there? Were you the only one there?

20

Louidor:  I – that what – that what you're saying, that I ruptured his –

Detective Reyes:  **No.  I'm telling you.  I'm not asking you.**

. . .

Louidor:   I love that kid like he was my own (indiscernible).

. . .

Detective Reyes:  What did that two-year-old boy do?

Louidor:  Yes.  I couldn't even sleep.

Detective Vera:  **You loved him to death.**

Detective Reyes:  **You loved him to death, yeah.**

Detective Vera:  **You loved him to death.**

Louidor:  Why would I kill a kid?

Detective Vera:  You loved him to death.

. . .

Detective Reyes:  What did he do so bad-

Detective Vera:  You could care less.

Detective Reyes:  -- for you to do that to him?

Louidor:   Mo-Mo – I love you, Mo-Mo[10].  You know that.

---

[10] Mo-Mo was Louidor's nickname for Daquan.

. . .

Detective Vera:  **Love you to death, Mo-Mo.  She loved you to death.**

Detective Reyes:  **Loved you to death.**

. . .

Detective Vera:  **You took away his life.**

. . .

Detective Reyes:  **Maybe you didn't mean to beat him like that, but you did.  You did.  You did.  And he's dead.**

Louidor:  And that's crushing to me.

Detective Vera:  Oh.

Detective Reyes:  It's so crushing.

Detective Vera:  No, it's not.

. . .

Detective Vera:  **You killed him.**

Louidor:  God feel it for me.

Detective Vera:  **You killed him.**

Louidor:  **No, I did not.**

Detective Vera:  **Yes, you did.**

Louidor:  **No, I did not sir.**

Detective Vera: **You killed him.**

. . .

Sergeant Gonzalez: **And I want to tell you something. Okay? And I'm looking you in the eyes. I don't believe you. You're lying to me. You know you're lying to me. I know you're lying to me.**

Louidor: How I lying –

Sergeant Gonzalez: **And you know and I know that you're lying to me. Okay? So-**

Louidor: How do you – okay. **Did you hear what you just said?**

Sergeant Gonzalez: **Yeah. Absolutely. I say you're lying to me.**

Louidor: **How do you know if I'm lying to you?**

Sergeant Gonzalez: **Because the facts speak for themselves.**

. . .

Sergeant Gonzalez: -- sooner or later you're going to have to face the facts of what you did.

. . .

Sergeant Gonzalez: Okay? **And you know what you did, and God knows what you did, and I know what you did. The only difference is God saw you do it. You saw yourself do it. Okay? I didn't see you do it.**

Louidor: **God didn't see me do it.**

Sergeant Gonzalez: **Of course he did.**

23

. . .

Sergeant Gonzalez: You know how the little baby feels right now? Nothing. He's dead –

Louidor: Don't – don't remind –

Sergeant Gonzalez: --because of you. Because of you.

Louidor: Don't remind me, because I couldn't even sleep at night.

Sergeant Gonzalez: **He's dead because of you. Of course. And you know what, Roseline? Many nights you're not going to sleep, because every night he's going to come and tell you, "Look what you did to me."**

Louidor: No, he won't.

Sergeant Gonzalez: Every night – Of course he will.

. . .

Sergeant Gonzalez: He's no longer a human being. He's a little angel in heaven with God –

Louidor: Mo-Mo, Mo-Mo, Mo-Mo.

Sergeant Gonzalez: -- **because you killed him.**

Louidor: I love you, Mo-Mo. I love you, Mo-Mo.

Sergeant Gonzalez: And the sad thing is you didn't even know who you killed. You didn't even know.

. . .

Sergeant Gonzalez: **You're lying to me when you tell me you don't know. You are lying to me. You are a liar. I'm telling you you are a lying person, and you're lying to me when you're telling me that you don't know.** It is impossible – okay? It is impossible for you not to know. **And anyone that sees you saying this is going to know you're lying. Incredible, unacceptable, unbelievable.** And the bottom line is this: You have an anger-control problem, and you lost your temper with him, and you beat him. Okay? **And you killed him.** And that's exactly what happened, and that's what you don't want to admit. And that's what you don't want to admit. Okay?

. . .

Sergeant Gonzalez: That's what happened Roseline. You overdid it, and you went "Uh-oh. So now what do I tell the cops? Let me come up with a lie. You know what? **You've been trying to stick to that lie ever since then.** You know what, Roseline? **From the first moment we didn't believe you. Just so you know. When you were here yesterday, we didn't believe you.**

Louidor: That what – that what –

Sergeant Gonzalez: **And I don't believe you now.**

. . .

Sergeant Gonzalez: . . . **But you know why I don't believe you? Because you're lying.** That's simple. All right? Because you want to sit here — It's bad enough – it's bad enough, Roseline, that you don't own up to what you did.

. . .

Sergeant Gonzalez: . . . **and there's no one in this world, as God as my witness, that will believe you,**

25

**Roseline.** Okay? No one – **You don't believe yourself. You don't believe yourself, because it's impossible. Okay? It is totally impossible.**

. . .

Sergeant Gonzalez: Okay. **That's going to be your downfall when this goes in front of a jury, because it – it's going to go in front of a jury, and they see you sitting here saying, "I didn't do it. I didn't do it."** The child didn't do it to himself. The dog didn't do it. The – either you, your boyfriend, or both of you. That's it.

All told, these excerpts comprise more than thirty separate instances in which the jury was allowed to watch and hear as these detectives expressed their personal opinion that Louidor was a liar and that they knew for a fact that Louidor was guilty of killing Daquan. And beyond merely stating their personal opinions that Louidor was guilty, the detectives created the unmistakable and unshakable impression that her guilt was a foregone conclusion; that what she told the detectives was "[i]ncredible, unacceptable, unbelievable;" and that the only purpose of the interrogation was to determine why she did it, how she did it, and whether anyone else participated with her in Daquan's murder. Each of the three detectives, on multiple occasions, expressed this sentiment during the course of this two-day interrogation.[11] As an example of each (emphasis added):

_____

[11] The case law recognizes this may be an acceptable interrogation technique, see e.g., Eugene v. State, 53 So. 3d 1104, 1111 (Fla. 4th DCA 2011), and I do not suggest any impropriety on the part of these officers in the interrogation techniques employed here. But beyond the confines of the interrogation room, and within the

**By Sergeant Gonzalez:**

Sergeant Gonzalez: **We're not asking you who did that. We know you did that. We're not asking who. We know it's you. I'm not going to argue with you. It was you.** And as far as I'm concerned, I want to get to the answer. **Not who. It was her. I want to know why. . . .**

Louidor: I promise on my life.

Sergeant Gonzalez: All right? **Not who.**

Louidor: I'm not a –

Sergeant Gonzalez: **It was her.**

. . . .

Sergeant Gonzalez: Okay? **And you know what you did**, and **God knows what you did**, and **I know what you did**. **The only difference is God saw you do it**. You saw yourself do it. Okay? I didn't see you do it.

Louidor: **God didn't see me do it**.

Sergeant Gonzalez: **Of course he did**.

. . .

**By Detective Reyes:**

Detective Reyes: **When you ruptured his liver,** was he the only one there? Were you the only one there?

---

confines of the courtroom, exposing the jurors to these detectives' continuous, repeated and self-assured opinions of Louidor's guilt (and of her incredibility) served no purpose in this trial except to improperly brand Louidor a liar and a murderer in the eyes of a jury.

Louidor:  I – that what – that what you're saying, that I ruptured his –

Detective Reyes:  **No.  I'm telling you.  I'm not asking you.**


. . .


**By Detective Vera:**

Detective Vera:  **You loved him to death.**

Detective Reyes:  You loved him to death, yeah.

Detective Vera:  **You loved him to death.**

Louidor:  Why would I kill a kid?

Detective Vera:  **You loved him to death.**

. . .

Detective Reyes:  What did he do so bad-

Detective Vera:  You could care less.

Detective Reyes:  -- for you to do that to him?

Louidor:  Mo-Mo – I love you, Mo-Mo.  You know that.

. . .

Detective Vera:  **Love you to death, Mo-Mo.  She loved you to death.**

Detective Reyes:  Loved you to death.

. . .

Detective Vera: **You took away his life.**

. . .

Detective Reyes: Maybe you didn't mean to beat him like that, but you did. You did. You did. And he's dead.

Louidor: And that's crushing to me.

Detective Vera: Oh.

Detective Reyes: It's so crushing.

Detective Vera: No, it's not.

. . .

Detective Vera: **You killed him.**

Louidor: God feel it for me.

Detective Vera: **You killed him.**

Louidor: No, I did not.

Detective Vera: **Yes, you did.**

Louidor: No, I did not sir.

Detective Vera: **You killed him.**

Additional excerpts played by the State irrevocably identified Louidor as unworthy of belief, tarnishing her credibility in the eyes of the jury before she ever took the witness stand. The jury was permitted to watch and hear at least twenty instances in which the detectives impermissibly told Louidor she was a liar,[12]

29

which undoubtedly "damaged [Louidor's] credibility before [s]he was afforded the opportunity to testify or present h[er] case." Jackson v. State, 107 So. 3d 328, 343-44 (Fla. 2012). Below are excerpted examples:

> Sergeant Gonzalez: And I want to tell you something. Okay? And I'm looking you in the eyes. **I don't believe you. You're lying to me. You know you're lying to me. I know you're lying to me.**
>
> Louidor: How I lying –
>
> Sergeant Gonzalez: **And you know and I know that you're lying to me.** Okay? So-
>
> Louidor: How do you – okay. Did you hear what you just said?
>
> Sergeant Gonzalez: Yeah. **Absolutely. I say you're lying to me.**
>
> Louidor: How do you know if I'm lying to you?
>
> Sergeant Gonzalez: Because the facts speak for themselves.
>
> . . .
>
> Sergeant Gonzalez: -- sooner or later you're going to have to face the facts of what you did.
>
> . . .
>
> Sergeant Gonzalez: **You're lying to me when you tell me you don't know. You are lying to me. You are a**

---

[12] These statements of personal opinion or personal knowledge of credibility and believability are inadmissible. See Tumblin v. State, 29 So. 3d 1093, 1101 (Fla. 2010). Moreover, these statements served as an additional (though more subtle) expression of the detectives' personal belief in Louidor's guilt.

30

**liar.** **I'm telling you you are a lying person, and you're lying to me when you're telling me that you don't know.** It is impossible – okay? It is impossible for you not to know. **And anyone that sees you saying this is going to know you're lying.** **Incredible, unacceptable, unbelievable.** And the bottom line is this: You have an anger-control problem, and you lost your temper with him, and you beat him. Okay? And you killed him. And that's exactly what happened, and that's what you don't want to admit. And that's what you don't want to admit. Okay?

. . .

Sergeant Gonzalez: That's what happened Roseline. You overdid it, and you went "Uh-oh. So now what do I tell the cops? **Let me come up with a lie.** You know what? **You've been trying to stick to that lie ever since then. You know what, Roseline? From the first moment we didn't believe you. Just so you know. When you were here yesterday, we didn't believe you.**

Louidor: That what – that what –

Sergeant Gonzalez: **And I don't believe you now.**

. . .

Sergeant Gonzalez: . . . **But you know why I don't believe you? Because you're lying.** That's simple. All right? Because you want to sit here — It's bad enough – **it's bad enough, Roseline, that you don't own up to what you did.**

. . .

31

> Sergeant Gonzalez: . . . **and there's no one in this world, as God as my witness, that will believe you, Roseline.** Okay? No one – **You don't believe yourself. You don't believe yourself, because it's impossible.** Okay? **It is totally impossible.**

And this final excerpt served to convey a message directly to the jurors that they should accept and embrace the very same opinions and sentiments expressed by the detectives throughout the interrogation:

> Sergeant Gonzalez: Okay. **That's going to be your downfall when this goes in front of a jury, because it – it's going to go in front of a jury, and they see you sitting here saying, "I didn't do it. I didn't do it."** The child didn't do it to himself. The dog didn't do it. The – either you, your boyfriend, or both of you. That's it.

The majority properly recognizes that Florida law prohibits the admission of the very evidence presented to the jury. Indeed, in <u>Martinez v. State</u>, 761 So. 2d 1074, 1079 (Fla. 2000), the Florida Supreme Court addressed the inadmissible nature of a witness' opinion as to an accused's guilt or innocence. The Court reaffirmed this in <u>Jackson</u>, 107 So. 3d at 339. In <u>Jackson</u>, the defense objected to the introduction of the evidence, preserving the issue and leaving open the question presented here: under what circumstances does the admission of this type of inflammatory evidence constitute fundamental error? The <u>Jackson</u> court provided some guidance which can be applied to the instant case. In addressing the harmful

32

effect of this type of evidence, the Court noted "there is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt," (quoting Martinez, 761 So. 2d at 1080) because "police officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy . . . [and] [a] jury is inclined to give great weight to their opinions." Jackson, 107 So. 3d at 340 (quoting Tumblin v. State, 29 So. 3d at 1101). See also Pausch v. State, 596 So. 2d 1216 (Fla. 2d DCA 1992). The Jackson court further acknowledged that "it is especially troublesome when a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." Jackson, 107 So. 3d at 340. (Emphasis added.)

There can be little question regarding the pernicious effect of the admission and use of the improper portions of the interrogation DVD. In this regard, the instant case bears striking similarities to the interrogation evidence improperly admitted in Jackson, and its impact on the jury. As the Supreme Court recognized:

> The great majority of the detectives' recorded statements are repeated expressions of ardent belief as to Jackson's guilt . . . [and] several of the detectives' questions were intended to resolve how and why Jackson killed [the victim] and not whether Jackson was the correct suspect . . . .
>
> The jury was likely inclined to attach particular significance to the detectives' many statements of Jackson's guilt and ignore Jackson's denials . . . .
>
> Additionally, the detectives' adamant belief in Jackson's guilt could have augmented the value of the State's circumstantial evidence,

33

validated the credibility of State witnesses, and damaged Jackson's credibility before he was afforded the opportunity to testify or present his case. Any chance the jury would have reasonable doubt regarding Jackson's guilt would have been obviated by quickly recalling the detectives' adamant belief in Jackson's guilt.

Id. at 343-44.

As the majority indicated, in both Jackson and Martinez the defendant objected to the evidence, preserving the issue for appeal and resulting in a harmless error analysis. In the instant case, defense counsel failed to object or preserve the issue, thus requiring Louidor to establish that the error was fundamental. However, the Supreme Court, most recently in Sheppard v. State, 151 So. 3d 1154 (Fla. 2014), applied the Jackson and Martinez holdings in the context of fundamental error. In Sheppard, a redacted version of the defendant's videotaped interrogation was played for the jury without objection from the defense. In that interrogation, a police detective accused Sheppard of lying, told him police knew he was the shooter or the driver of the car from which the victim was shot, and told him that if he could not make the detectives believe him, he would never convince a jury. Id. at 1165-66.

As in the present case, Sheppard failed to object to the introduction of the redacted video, and thus, he was required to establish fundamental error.[13]

---

[13] The majority concludes that Louidor's counsel "invited the error" by stipulating to the admission of the partially redacted video, and that this stipulation forecloses any claim of fundamental error on appeal. I cannot agree with either the characterization or its effect. First, the only stipulation was to those portions of the

However, the Sheppard Court found that the error did not rise to the level of

DVD that had been removed by agreement, together with an agreed-upon instruction to the jury. When the State laid its foundation and moved the DVD into evidence, the defense indicated simply "no objection." Thereafter, the court instructed the jury (per the agreed-upon instruction) that portions of the DVD had been redacted by stipulation of the parties, and that the jury should not speculate about the portions that have been redacted.

Further, this is not a situation where defense counsel agreed to the admission of evidence he knew was patently inadmissible. In fact, there is no evidence that the defense, the State or the court knowingly permitted the jury to be exposed to evidence that indisputably should have been excluded. In the absence of such, this is not a case of invited error. Similarly, the Court in Sheppard did not characterize the defense's agreement to the admission of the video as invited error. Nor should we. Given the record below, defense counsel's "stipulation" was nothing more than an agreement to the admission of the DVD, and carries no greater legal significance than would a failure to object when the DVD was offered into evidence at the trial.

Moreover, I cannot ignore the fact that the State has an independent obligation to not knowingly introduce inadmissible evidence. See Molina v. State, 447 So. 2d 253, 255 (Fla. 3d DCA 1983) (Pearson, J., concurring) (noting "[a]lthough a conviction in a strong case may be affirmed on a harmless error theory, that is not an invitation to prosecutors to commit the error and does not in any way affect their obligation to avoid deliberately eliciting inadmissible testimony in order to further tip the scales against the defendant."); Steward v. State, 619 So. 2d 394, 398 n.3 (Fla. 1st DCA 1993); Kirk v. State, 227 So. 2d 40, 42-43 (Fla. 4th DCA 1969) (holding "[i]t is. . . the duty of the prosecuting attorney in a trial to refrain from making improper remarks or committing acts which would or might tend to affect the fairness and impartiality to which the accused is entitled. The prosecuting attorney in a criminal case has an even greater responsibility than counsel for an individual client. For the purpose of the individual case he represents the great authority of the State of Florida. His duty is not to obtain convictions but to seek justice, and he must exercise that responsibility with the circumspection and dignity the occasion calls for. His case must rest on evidence, not innuendo.") (Citation omitted.) Further, the trial court has a gatekeeping role to ensure inadmissible evidence is not presented to the jury and to otherwise safeguard the due process rights of the accused. See McClean v. State, 934 So. 2d 1248, 1261-63 (Fla. 2006); Grier v. State, 27 So. 3d 97, 101 (Fla. 4th DCA 2009). See also Sheppard, 151 So. 3d at 1177 (Pariente, J., concurring) (warning "this

fundamental error:

> In this case, Detective Bowers did not repeatedly state his personal opinion that Sheppard was guilty of murder. He did accuse Sheppard of lying in several respects, and warned Sheppard that he knew the answers to many of the questions he was asking. Prior to any accusations of lying, Detective Bowers expressly reminded Sheppard that he did not need to answer any questions, but if he did answer, he should not lie. When Sheppard denied being in the PYC gang, Bowers warned him again about lying and pointed out the PYC tattoo on Sheppard's arm. Sheppard also initially denied any knowledge of the carjacking of Dorsette James's car, which was later identified as the car from which Wimberly was shot. However, Bowers confronted Sheppard with photographic evidence placing him and Evans at the convenience store, evidence that the victim said he was carjacked at gunpoint, and the statement that Evans told officers that he was not the killer. Only after that did Sheppard admit to taking the car to "joyride." Thus, this line of questioning and the comments by Bowers successfully obtained Sheppard's confession that he did take the car, although Sheppard continued to maintain he was not involved in the Wimberly shooting.
>
> When Sheppard kept insisting that he did not take James's car by force, Bowers did say, "Tell me the whole truth or none of the truth. We're trying to get on a (inaudible) where I can believe you because that's important to you, and you know that if I can't make (inaudible) you know you won't be able to convince 12 people." Although this implication that Sheppard would bear any burden of proof at a trial was improper, no further mention was made of whether Sheppard can or cannot convince a jury in a criminal trial, and does not rise to the level of fundamental error.

Id. at 1167 (footnote omitted).

---

Court's determination that no fundamental error occurred based on the particular circumstances of this case should not be construed as an endorsement of the admission of this type of interrogation into evidence, and all parties should take great care to ensure that the jury is not exposed to improper interrogation that could cast doubt on the validity of the conviction.") (Emphasis added.)

There are important distinctions between the instant case and Sheppard. In Sheppard, the questioning eventually led Sheppard to confess to his involvement in at least some of the criminal activity that led to the shooting. Id. Sheppard confessed, during the interrogation, to having stolen the vehicle. Thus, the interrogation and the context in which Sheppard made this confession, was relevant and admissible to establish the nature and extent of Sheppard's admitted criminal involvement. By contrast, Louidor never admitted to any culpability or involvement in any illegal acts, notwithstanding the consistent and repeated accusations by three different detectives that she was guilty of murder and that she was lying to them.

In Sheppard, the Supreme Court determined that "Detective Bowers did not repeatedly state his personal opinion that Sheppard was guilty of murder." Id. By contrast, in the instant case, the three detectives did repeatedly and continuously state their personal opinion that Louidor was guilty of murder and did repeatedly and continuously state their personal opinion that Louidor was lying.

Although the detective in Sheppard did accuse Sheppard of lying in several respects, he warned Sheppard ahead of time that he (the detective) already knew the answers to questions he was asking, and warned Sheppard that he did not have to answer but that if he did, he should not lie. Id. The line of questioning to Sheppard and the detective's confrontation with evidence that he was lying was, in

37

context, a proper interrogation technique and ultimately succeeded in getting Sheppard to acknowledge that he took the car belonging to one of the murder victims. The same cannot be said in the instant case and admission of those portions of the DVD were not only irrelevant but irreparably prejudicial.

The instant case does not involve merely a passing mention or single instance of improper opinion, assertion of guilt or prejudicial statement. Rather, this case presents the very circumstance exemplified by the Court's admonition in Jackson: a case in which "a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." Jackson, 107 So. 3d at 340. The litany of impropriety became a centerpiece of the State's case and excerpts were shown to the jury multiple times during the trial. Compounding these errors were the twenty or more instances during the interrogation in which the detectives labeled Louidor a liar. The cumulative effect of the repeated use of this evidence, when considered in its totality, reached down into the validity of the trial itself, and denied Louidor a fundamentally fair trial.

In Sheppard, 151 So. 3d at 1168, the Supreme Court concluded the facts did not represent "one of the rare cases in which the interests of justice present a compelling demand for application of the principle of fundamental error," but in so doing reaffirmed its holdings in Tumblin, Martinez and Jackson:

> Even though we find no fundamental error in admission of the videotape, we reiterate that a jury is inclined to give great weight to

38

the statements made by law enforcement officers by virtue of their position. See Tumblin v. State, 29 So.3d 1093, 1101 (Fla. 2010). For this reason, great care should be taken by law enforcement and by prosecutors that such statements expressing belief in the defendant's guilt or belief that the defendant is lying generally not be placed before the jury. There is "increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt." Martinez v. State, 761 So.2d 1074, 1080 (Fla. 2000). As we cautioned in Jackson, "it is especially troublesome when a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." Jackson, 107 So. 3d at 340.

Id.

The instant case does represent one of those rare cases in which the interests of justice present a compelling demand for the application of the principle of fundamental error. The jury watched and listened while three different detectives, over a two-day period, time and again told Louidor they knew she was guilty of murder and that the jury would know she was guilty. The detectives' statements were at times accusatory and at other times very matter-of-fact. The clear import of this unbroken theme conveyed to the jury that it was beyond question that anyone other than Louidor had committed this heinous crime; that each of the detectives knew this for a fact; that Louidor was a liar and her protestations of innocence were incredible and unbelievable; and that Louidor was lying to the detectives, to herself, and to the jury who would eventually view this interrogation during her trial.

39

Surely it would have been sufficiently egregious if these portions of the interrogation DVD were played to the jury on a single occasion. But they were played on multiple occasions during the course of the trial, and the DVD was sent back to the jury room for the jurors to view during their deliberations.[14]

It cannot be gainsaid that fundamental error is a concept that should be invoked only rarely. On this, both the majority and I are in complete agreement. Appellate courts must be particularly mindful of the general rule that a contemporaneous objection is needed to preserve an error for appeal. In addition:

> The requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of a judicial system. It places the trial judge on notice that error may have been committed, and provides [the judge] with an opportunity to correct it at an early stage of the proceedings. Delay and an unnecessary use of the appellate process result from a failure to cure early that which must be cured eventually.
>
> The requirement of contemporaneous objection thus not only affords trial judges the opportunity to address and possibly redress a claimed error, it also prevents counsel from allowing errors in the proceedings to go unchallenged and later using the error to a client's tactical advantage.

F.B. v. State, 852 So. 2d 226, 229 (Fla. 2003) (quoting Castor v. State, 365 So. 2d 701, 703 (Fla. 1978)).

---

[14] The trial court sent the DVD into the jury room with the equipment necessary for the jurors to play and view the DVD during deliberations without further notification of, or assistance from, the court. We can therefore only speculate whether, and the extent to which, the jury viewed the DVD during their deliberations.

I further recognize that, had an objection been made upon the very first instance the improper portion of the videotape was presented to the jury, the trial court likely could have redressed this isolated error with an appropriate curative instruction to the jury, preventing any subsequent use of this improper evidence. However, given the absence of an objection and the continuous and repeated display of this evidence before the jury during the direct and redirect testimony of Detective Reyes, during the cross-examination of the defendant, and during closing argument, there can be little question that Louidor's right to a fundamentally fair trial was damaged beyond repair, resulting in a denial of due process.[15]

Finally, I address the majority's conclusion that the admission of this evidence was somehow born of a "strategic" decision by defense counsel, and that

---

[15] The majority opinion states that, for error to be considered fundamental, it must "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Majority opinion at 12 (quoting Odeh v. State, 82 So. 3d 915, 921 (Fla. 4th DCA 2011) and F.B., 852 So. 2d at 229). While this is an accurate definition of fundamental error (and while I believe this case meets that definition), it is also incomplete. The Supreme Court has also characterized, as "fundamental," error which goes to the foundation of the case, amounting to a denial of due process. Ray v. State, 403 So. 2d 956, 960 (Fla. 1981). See also, e.g., Martinez v. State, 933 So. 2d 1155, 1159 (Fla. 3d DCA 2006) (noting that "[f]undamental error is an error that would result in a miscarriage of justice if not considered. . . and is of such a nature that it essentially amounts to a denial of due process"). The instant case likewise meets this definition of fundamental error, and represents one of those "rare cases . . . where the interests of justice present a compelling demand for its application." Ray, 403 So. 2d at 960.

therefore Louidor's relief, if any, must be found in a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.

First, I find virtually no evidence in the record to support the conclusion that the defense made any such strategic decision. The only record evidence offered by the majority in this regard are the following portions of defense counsel's opening statement and closing argument:

Opening statement:

Then we go to the police investigation. The police investigation— they brought her in. The interviewed her. You're gonna see the videotape. **You look at it, and you make up your mind as to what was said and what was not said.** (Emphasis supplied by majority.)

Closing argument:

They can go to the tape, and they can pick and choose all they want. But you know the tape—and you know at least the first interview was like basically a shouting match and an accusation, where all they were doing is, "you're guilty. You're guilty. You're guilty," to get her to say "Oh, yeah. I struck this child." That's what that was. Did anybody give her-- did anybody have, like, a normal conversation? And then the prosecutor says, "You know she must be lying here, because look at – look at how she's shouting in- in- in the tape." Well, here, this is a court of law, here we know we have a judge. We make objections. People are talked to like human beings, not like animals, like the three people over here, which basically that's what they did. They didn't let her talk. They were in her face, and people don't react well to people being in their face. They tend to raise your voice. **But I suggest to you that—suggest to you that the child was in the care of the mother, and she told them on that day time and time again.** Even one of the—even one of the parts that they played, where the last detective goes in there—the one who's talking about God and whatnot, "How do you think"—You know, they have, like a guessing game. **"How do you think the injuries got there?" What**

42

**does she say? "Ask the mother. Look at the mother."** (Emphasis supplied by majority.)

These excerpts cannot reasonably serve as evidence that defense counsel made an informed, strategic decision to permit the admission of the indisputably inadmissible portions of the DVD. The opening statement excerpt makes no reference whatsoever to the inadmissible portions of the DVD, but only a generic reference to the DVD itself and a boilerplate "you decide what the evidence is" request to the jury. Thus, the opening statement excerpt is neither helpful nor relevant to the analysis of whether the decision not to object to the DVD could have been strategic.

As to the closing argument, there is but a singular reference to the detectives' improper assertion of Louidor's guilt ("You're guilty. You're guilty. You're guilty.") But for this sentence, the exact same closing argument excerpted above could have been made by defense counsel if the DVD had been properly redacted to excise the wholly improper and inadmissible portions. That is because this portion of defense counsel's closing argument was not intended to address, use, incorporate or rely upon the inadmissible portions of the DVD. Instead, it is clear that the thrust of this portion of the closing was to point out the aggressive manner of the detectives' interrogation, and to explain why Louidor herself had raised her voice in response. Had counsel objected to (and the court excluded) the inadmissible portions of the DVD, the remaining (and admissible) portions would

43

have permitted defense counsel to make precisely the same argument in closing. These portions of defense counsel's opening and closing arguments, offered by the majority as evidence of a strategic decision, fall woefully short.

More to the point, the majority cites no other record evidence that defense counsel used or relied upon this inadmissible evidence or otherwise incorporated it into any theory of defense. The trial lasted four days, comprising more than 1000 transcript pages. The State presented six witnesses in its case, each of whom was cross-examined by defense counsel. Louidor testified in her own defense at trial. And yet the only relevant record evidence cited by the majority is this single line from defense counsel's closing. This is a slim reed indeed upon which to base a conclusion that defense counsel's decision was a strategic one and I cannot agree that the record supports such a conclusion.

Second, I disagree that the standard to be applied is "any possibility" that the decision not to object was strategic. In the context of a failure to object to the admission of evidence, such a standard is likely insurmountable: how can a defendant establish on a trial record that there is *no possibility* that counsel's failure to object to the admission of evidence was strategic? I recognize that some courts have utilized the "any possibility" standard in determining whether a failure to object was strategic. See e.g., Coulliette v. State, 949 So. 2d 1078 (Fla. 1st DCA 2007). As a practical matter, however, such a standard is illusory in this context,

44

and will bar any claim of fundamental error as applied to a failure to object to inadmissible evidence. A reviewing court can almost always conceive of a theoretical or hypothetical strategy reason for a failure to object to the admission of evidence. Such a standard would therefore foreclose any determination that the improperly admitted evidence—no matter how egregious, no matter how central to the case, no matter how many times the jury is exposed to it—rises to the level of fundamental error. If "any possibility" is the standard to be applied, then it might well be appropriate for this court, or the Florida Supreme Court, to hold that the principle of fundamental error is inapplicable to an unpreserved evidentiary error at trial. See State v. Osvath, 661 So. 2d 1252, 1254 (Fla. 3d DCA 1995) (observing in *dicta* that there appeared at the time to be no reported cases in Florida in which fundamental error was invoked to cure an unpreserved evidentiary error at trial).

In the absence of a holding that unpreserved evidentiary errors are foreclosed from fundamental error consideration, I cannot agree that the "any possibility" standard is sufficient to protect one's right to due process and a fundamentally fair trial, nor does the prospect of filing a postconviction motion alleging ineffective assistance of counsel serve as a constitutionally adequate alternative. I believe the more appropriate standard would require a defendant to establish there is "no reasonable possibility" that the failure to object was strategic. Based upon the record below, I conclude that there is no reasonable possibility that

45

defense counsel's failure to object was strategic, and that the admission of this evidence was fundamental error, requiring a new trial.

For these reasons, I respectfully dissent.